## EDGAR SMITH V. THE STATE.

No. 20768.  Judgment Affirmed January 24, 1940.
Rehearing Denied February 21, 1940.
Appealed to United States Supreme Court.
Petition for Writ of Certiorari Allowed by United States Supreme Court
April 22, 1940.
Mandate of United States Supreme Court, reversing the judgment of the Court of
Criminal Appeals, filed January 3, 1941.
Order of Court of Criminal Appeals remanding cause to trial court for further
proceedings in said cause, as may be consistent with the opinion of the
Supreme Court of the United States, reversing the judgment of
Court of Criminal Appeals, filed January 8, 1941.

The opinion states the case.

*Sam W. Davis* and *Harry W. Freeman,* both of Houston, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

KRUEGER, Judge.

The offense is rape. The punishment assessed is confinement in the state penitentiary for life.

The evidence offered by the State shows a case of rape by force. Appellant made a confession to the officers in due form, which confession if true, showed appellant to be guilty of the offense. On the trial, appellant took the witness stand and repudiated the confession. He claimed that the act of intercourse was with the consent of prosecutrix. The only issue raised by his testimony was whether or not she consented to the act, and this the jury decided adversely to his contention.

Appellant complains of the action of the court in overruling his motion to quash the indictment on the ground that the jury commissioners selected by the district judge to draw a grand jury for the August Term (at which term appellant was tried) had intentionally and arbitrarily excluded all persons of African descent from serving thereon. He alleged that he was a member of the negro race and that the practice of excluding negroes from grand and petit juries had been resorted to and systematically engaged in by the jury commissioners for a number of years preceding the time of the return of the indictment on which the prosecution was based. That these acts were in contravention of the 14th Amendment to the Constitution of the United States and in violation of Art. 1 of the Constitution of the State of Texas, etc.

This motion was contested by the State and the court heard evidence thereon. We do not deem it necessary to set out the

evidence at length, but it is our opinion that the same wholly fails to show an intentional and arbitrary refusal to select negroes for grand jury service on the panel that returned the indictment against the appellant. All of the grand jury commissioners stated there was no express and intentional disregard for members of the negro race. Appellant is then relegated to contending that the discrimination is shown by the long continued and uninterrupted failure to summon a member of the negro race for grand jury service as showing discrimination as a matter of law. The evidence in this respect shows that on a number of previous occasions, the jury commissioners had selected negroes as prospective grand jurors. It is shown that in 1936 a negro served on the grand jury, and others had been repeatedly drawn for the grand jury panel—both prior and subsequent thereto. We think the evidence presented was such that the court was justified in reaching the conclusion that race discrimination was not intentionally and deliberately practiced by the jury commissioners. The case of Johnson v. State, 124 S. W. (2d), 1001 and authorities there cited are not in point, since the evidence in this case is conflicting. Appellant admits in his able brief that none of the cases cited by him are exact authorities, but insists that the only distinction is one of form —that in those cases it clearly appeared that there was discrimination, while in the case at bar discrimination is covered by a veneer which seems to be a scheme to avoid those decisions. A sufficient answer to any such contention is that the evidence does not show an arbitrary discrimination and we would not be justified in ferreting out such schemes when the evidence was sharply conflicting as to the existence of discrimination at all. This is rather a serious charge against the officers charged with the administration of the law. They are not only presumed to fairly and impartially administer the same, but under their oath are bound to do so; and in the absence of clear and convincing proof to the contrary, the presumption obtains that they did so. See Lugo v. State, 124 S. W. (2d), 344; Hamilton v. State, No. 20726, not yet reported; (138 Texas Crim. Rep., 205) Washington v. State, 103 S. W. 879.

By bill of exception No. 2, appellant complains because the court declined to grant appellant's request to declare a mistrial after prosecutrix was recalled by the State and asked if the various acts of familiarity by her with appellant (as testified to by him) were true; that she emphatically denied them and called upon God to bear witness to the truth of her statement of the case and then fainted. That the behavior of prose-

cutrix in fainting made it impossible for him to continue his cross-examination of her without prejudicing the jury against him. The court states in his qualification of the bill that he does not certify that anything happened in connection with this witness' conduct or behavior which would prejudice appellant's cause in the eyes of the jury or that prosecutrix swooned and passed out, etc. He also states that this witness, after the occurrence in question was in attendance upon the court and was capable (as far as the court knew) to continue testifying. The bill, with the court's qualification thereto, was accepted by appellant and he is bound thereby. As thus qualified it fails to reflect reversible error, since such qualification would indicate that all that really happened was that the witness cried out for God to bear witness to the truth of her statements, and fainted. The court instructed the jury to disregard such conduct, and any statements not made by her in response to questions. It also appears that the jury was immediately retired. It is not alleged that such conduct on her part was intentional. To the contrary it is inferable that it was the result of long and protracted questioning of a white woman who had been assaulted by a negro. Under the circumstances, we do not think this matter reflects reversible error. See Long v. State, 127 S. W. 551; Burge v. State, 167 S. W., 63.

There are a number of special requested charges which were submitted by appellant to the trial court. It appears, however, that the appellant did not except to the refusal of the trial court to give these charges. Consequently, we are not authorized to consider them. It has been repeatedly held that it must be made to appear affirmatively that exception was reserved to the refusal of special charges before they were properly before us for review. See Cunningham v. State, 97 Texas Crim. Rep., 624, 262 S. W., 491; Craven v. State, 93 Texas Crim. Rep., 329, 247 S. W., 515; Brooks v. State, 247 S. W., 517; Linder v. State, 250 S. W., 703, 4 Texas Juris., p. 99 and the authorities there collated.

All other matters complained of by appellant have been considered by us and are deemed to be without merit.

The judgment of the trial court is affirmed.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

ON APPELLANT'S MOTION FOR REHEARING.

CHRISTIAN, Judge.

Appellant reiterates his contention that the jury commission intentionally and arbitrarily excluded all persons of African descent in selecting the grand jury. Looking to the testimony heard upon the motion to quash the indictment, it is observed that we were in error in our statement in the original opinion that all the jury commissioners testified that there was no intentional exclusion of members of the negro race from the grand jury. Only two of the commissioners testified upon the hearing. Mr. Elliott, one of the commissioners, testified that he did not recall whether any negroes were drawn by the commission. He said that the names of some negroes were mentioned during the time the selection was being made. Further, he testified that he did not suggest a negro because he did not know the name of any negro at the time living in Harris County who possessed the qualifications of a grand juror. On his cross-examination he said: "I did not intentionally, arbitrarily and systematically discriminate against any negro being selected on that grand jury." Mr. Davis, the other member of the jury commission who testified upon the hearing, said that in selecting the grand jury he felt that it was the duty of the commission "to be fair to all classes in the county." Further, he testified that he suggested the name of no negro because he was not personally acquainted with any member of the negro race. Upon cross-examination he said: "The other two grand-jury commissioners and I did not intentionally, arbitrarily and systematically discriminate against putting a negro on the grand jury panel because of his race or color; that is, I did not, and nothing was said by the other two to that effect." It appears from the agreement entered into between the district attorney and counsel for appellant that in 1930 there were 72,603 negroes in Harris County, including men, women and children. Furthermore, it appears that in 1937 between 7,000 and 8,000 negroes paid their poll taxes. Again, it was shown that a large number of negroes possessed the qualifications of grand jurors. W. K. Richardson, a witness for the State, testified that four grand juries were selected each year. He said: "During the seven years I have been associated with the grand jury I would say that five or six negroes have served on grand juries; that is just a guess. I think one of those negroes served two different times, not in succession." He testified that there was no negro on the grand jury that indicted appellant. At this juncture we quote

from his testimony, as follows: "I have been present on practically all occasions when Judge King and Judge Boyd have charged the grand jury commissions on the selection of grand jurors. They have been instructed to select citizens from all parts of the county and of all different races or walks of life. The court instructed the grand jury commissioners on the law governing the selecting of grand jurors. I do not recall seeing any negro grand jury commissioner; they have all been white that I have seen."

C. F. Richardson, a witness for appellant, testified that there were approximately 6,000 negro men who paid poll taxes in Harris County during the year 1938. He could not say how many of these men possessed the qualifications of grand jurors. We quote from his testimony as follows: "I can almost count the names of the negroes who served on the grand jury in the last ten years." The witness named approximately seven negroes.

Several negro men testified that they had never served on a grand jury. Their testimony was to the further effect that they possessed the qualifications of grand jurors. There was testimony to the effect that there were very few illiterate negroes in the county. There was also testimony to the effect that about eighteen negroes had been drawn by the jury commission for grand jury service since 1931. The clerk of Criminal District Court No. 2 of Harris County testified that on several occasions the negro on the panel was number sixteen. However, his testimony was to the further effect that negroes had been serving on the grand juries.

The trial judge testified that he made it a rule to instruct the jury commissioners that there should be no discrimination against any race, color or religion. He said: "I have reminded them particularly of the negro population each time, though I could not instruct them who to put on the grand jury, and that the negro race must not be discriminated against. Several times since I have been here negroes have served on the grand jury. I don't know how many different races of people there are in this county. * * *"

Appellant insists that the holding of this court in Johnson v. State, 124 S. W. (2d) 1001, is controlling. He also relies upon the case of Norris v. Alabama, 294 U. S. 587, 79 L. Ed. 1074, and Pierre v. State of Louisiana, 306 U. S. 354, and other cases which he cites in his brief. In the Norris case the evidence showed that for a long number of years no negroes had been selected for jury service, witness saying that none had ever

been so called within their memory, the ages of such witnesses ranging from 50 to 76 years. In reaching the conclusion that Norris, who was a negro, had been discriminated against in the selection of the grand jury, the Supreme Court of the United States said: "That testimony in itself made out a prima facie case of the denial of the equal protection which the Constitution guarantees." In Johnson v. State, supra, it was shown that for thirty years no person of the negro race had been selected as a grand juror, during which time a number of persons belonging to said race lived in the county who were qualified voters and qualified to serve on grand juries. In holding that the indictment against Johnson, who was a negro, should have been quashed because he had been discriminated against in the selection of the grand jury, we followed Norris v. Alabama, supra, and Hale v. Commonwealth of Kentucky, 82 L. Ed. 1050.

We think the present case is distinguishable upon the facts from the cases upon which appellant relies. Here it is made to appear that negroes had been drawn for grand jury service during the last ten years. It is true that in some cases those who were drawn did not serve. However, negroes had served on the grand jury during such period of time. We do not understand that the different classes composing the population of a county must have equal representation upon the grand jury. The question for our determination is whether the trial judge was warranted in concluding from the testimony adduced upon the motion to quash that negroes had been intentionally excluded from the grand jury because of their race. The court heard the testimony of two of the grand jury commissioners to the effect that discrimination had not been practiced. Further, he heard testimony to the effect that negroes had been selected for grand jury service and that several negroes had served on the grand jury during the last ten years. In view of such testimony, we would not feel warranted in holding that the trial judge abused his discretion in overruling the motion to quash. To hold otherwise would be to say that every grand jury must have a member of the negro race on the panel before an indictment can be properly returned against any member of such race, notwithstanding the testimony warrants the conclusion that there had been no arbitrary discrimination against the negro race. It follows from what we have said that we are constrained to adhere to the conclusion expressed in the original opinion.

Appellant insists the the evidence fails to comport with human experience because it was shown that appellant remained at the home of the prosecutrix after he had had sexual inter-

course with her. It appears to be appellant's contention that the fact that he did not leave the scene of the alleged rape destroys the testimony of the prosecutrix to the effect that she was forcibly ravished and warrants no other conclusion than that she consented to the act of intercourse. According to the testimony of prosecutrix, appellant grabbed her in her home, forcibly carried her to a bed, and by the use of force which she was unable to overcome, had an act of sexual intercourse with her. Not only the testimony of prosecutrix, but that of other witnesses, shows that she immediately reported the matter to a neighbor. She was greatly excited at the time of making the report. An examination by a physician disclosed that some one had had an act of intercourse with her. The physician who examined her testified, in part, as follows:

"I examined Mrs. Heiden. She was terribly shocked and she told me she had been attacked by a negro. Mrs. Middlestedt did most of the talking. I made a vaginal examination and found some serous fluid there mixed with quite a little blood. I couldn't make a successful microscopic of it; I turned it over to Professor Oliphant, and he went to the school building to make it.

"I saw some slight scratches on her upper and lower limbs. I did not see any bruises on her wrist. The scratches on her limbs were such as could have been made from briars or brush. There was no discoloration of her wrists that I could ascertain at the time I examined her. The lower limbs were scratched up more than the upper ones. They appeared to be briar scratches.

"I made a vaginal examination; I found some serous fluid mixed up with quite a bit of hemorrhage; the posterior wall of the hymen was bleeding. The bleeding was such as might result from intercourse with a young strong man.

"I talked to Mrs. Heiden at the time I examined her, but she talked in German some and I couldn't understand it; she couldn't tell me much as she was badly unnerved and shocked. She talked in German to Mrs. Middlestedt, and she told me. I did not give Mrs. Heiden a douche; I just mopped her out. Mrs. Heiden told me she had been attacked by this negro."

We quote from appellant's written confession as follows:

"I have been working for Mr. Heiden for the past seven months, working out there on his farm doing farm work, during the time that I have worked there I was fed from their kitchen, and my salary was eighteen dollars a month and board. Last

Monday I worked on the farm chopped peas, that afternoon when I finished cutting peas I drove up the cows.

"I rode my horse up in the yard after I drove the cows up, and I spoke to Mrs. Heiden's brother Adolph Strack, after he left, the children came up in the truck with Mrs. Heiden's two son-in-laws they did not stay but a few minutes, and when they left Mrs. Heiden's daughters were in the truck also, they all drove off in their cars and I did not hear them say where they were going, when they left I went in the house to get the milk bucket Mr. Strack was in the house and I spoke to him, and then I went out to milk and while I was milking Mr. Strack left.

"When I came back from milking I asked Mrs. Heiden to fix my supper. She told me she did not have time and for me to fix it myself as she was busy peeling pears, then I fixed my supper, Mrs. Heiden was on the front side gallery, the next thing that happened Mrs. Heiden came in the kitchen and then went out in the yard and got some clothes * * * After she got in the room then I caught her by both arms this was in the back bed room after I grabbed her I laid her on the bed, I turned the left arm loose first and pulled up her dress, then I pulled up her dress that is when I put my privates into her privates, after I put it in her I held both wrist again.

"I was on her for about four or five minutes until I finished and cum. When I got up I went out the back and she was still in the house and I did not see her when she left the house, then I went out on the front porch and laid down and stayed there until her two son-in-laws came up and took me down on the road where we met some more people and then they all took me over to Paul Mittelstedt's where the officers were, after I committed this act I do not know why I stayed there but I did, after this was over I did not wash and have not washed since, I had only one sexual intercourse with Mrs. Heiden.

"The bruises on Mrs. Heiden's arms are from where I held her, at the time that I released the left arm is when I raised up her dress and had sexual intercourse with her, she hollered quit twice."

It is true that appellant repudiated his confession and gave testimony to the effect that prosecutrix invited him to have sexual relations with her. In short, it was his version that she freely consented to the act. The State took issue with appellant, and offered testimony to the effect that the identical confession introduced in evidence had been made by appellant and that no

coercion or persuasion of any character had been used at the time such confession was made. This issue was properly submitted to the jury for their consideration.

Looking to the testimony in its entirety, we are constrained to adhere to the conclusion expressed in the original opinion that the evidence is sufficient to support the judgment of conviction.

The motion for rehearing is overruled.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ORDER.

HAWKINS, Presiding Judge.

The judgment of conviction was affirmed on January 24, 1940. Motion for rehearing was overruled February 21, 1940. Appellant made application to the Supreme Court of the United States for writ of certiorari to review the action of this Court. The writ was granted and on November 24, 1940 the Supreme Court of the United States reversed the judgment of this Court and remanded said cause for further proceedings not inconsistent with the opinion of said Supreme Court of the United States.

Therefore, in compliance with said opinion this cause is remanded to the trial court for further proceeding in said cause, as may be consistent with the opinion of the Supreme Court of the United States.

Accompanying this order, and made a part thereof, is a certified copy of the mandate from the Supreme Court of the United States, now on file as a part of the record in this cause.

This the 8th day of January, 1941.