In Cross v. State, 129 Tex. Cr. Rep. 526, 89 S.W. 2d 217, the district attorney said:

### HERMAN LEE ROSS V. STATE.

No. 24630. April 19, 1950.
State's Motion for Rehearing Granted June 7, 1950.
Appellant's Motion for Rehearing Denied October 25, 1950.
Mandate of the Supreme Court of the United States, Reversing
on Writ of Certiorari, filed April 30, 1951.
Reversed and Remanded June 6, 1951.

Hon. C. G. Dibrell, Judge Presiding.

*Thos. H. Dent*, Galveston, for appellant.

*Raymond E. Magee*, County Attorney, and *Emmett F. Magee*, Special Prosecutor, Galveston, and *George P. Blackburn*, State's Attorney, Austin, for the state.

BEAUCHAMP, Judge.

The appeal is from a conviction for murder, with the death penalty.

The indictment alleges that Herman Lee Ross, the appellant killed Guido Nesti on the 1st day of June, 1948, by shooting him with a gun.

Nesti was the keeper of a package store. Appellant went to his place at night and, in the perpetration of a robbery, shot his victim to death while he was standing with his hands up. He then walked away from the scene. Parties who witnessed

the crime recognized appellant as he walked away, according to their testimony on the trial. Further facts in the case, including the circumstances of his arrest, his resistance and his shooting at the officers, certainly do not detract from the heinousness of his crime.

Thomas Dent, an attorney of the colored race, represented appellant and timely filed his motion to quash the indictment on the ground that the grand jury returning the indictment was composed entirely of white men. It is his position that in the impanelment of the grand jury discrimination against the colored race was shown contrary to the provisions of the Constitution of the United States. This raises a federal question, of which the Supreme Court of the United States has jurisdiction. If that court assumes jurisdiction, its decision is final.

Upon the issue thus raised there is in the record an agreement between state's attorneys and appellant's attorney, approved by the trial judge, that all appellate courts might determine the merits of appellant's motion to quash the indictment on the issue of discrimination on such agreed statement of facts. It is not thought necessary to set out the facts incorporated in the agreement. It is appellant's contention that under the authority of the opinions of the Supreme Court of the United States the facts, upon the question of discrimination, bring him squarely within the holdings in the cases of Neal v. Delaware, 103 U. S. 370; 26 L. Ed. 567; Norris v. Alabama, 294 U. S. 587, 79 L. Ed. 1074, 55 S. Ct. 579; Pierre v. Louisiana, 306 U. S. 354, 83 L. Ed. 757, 59 S. Ct. 536; Smith v. Texas, 140 Tex. Cr. R. 565, 136 S. W. 2d 842, 311 U. S. 128, 85 L. Ed. 84; 61 S. Ct. 164; Hill v. Texas, 144 Tex. Cr. R. 415, 157 S.W. 2d 369, 316 U.S. 400, 86 L. Ed. 1559, 62 S. Ct. 1159. The facts in the two Texas cases are so similar to those shown in the agreed statement found in the present record that no reasonable ground can be discovered why the holding of the Supreme Court of the United States in the Smith and Hill cases would not be followed by that court.

The facts of this case show without dispute a murder for the purpose of perpetrating a robbery. The appellant is a Negro, his victim a white man, an Italian by birth. In addition to the circumstances of the crime, appellant's own witness placed on the stand by his attorney to testify in his behalf, Dr. E. A. Etter, testified that he had known appellant all of his life; that he had long been a sufferer from tuberculosis and syphilis; that: "He has been an outcast, a waif of society, * * *." He said that ap-

pellant had a tendency to kill and wanted to kill, and that he had never mixed with society or made any contribution to it.

It would in the opinion of the writer, be a reflection on the colored race to say that they would not return an indictment in this case, even if the grand jury was composed of Negroes in its entirety. We disclaim any intention to hold that any one of them would object to the return of a bill of indictment of this appellant, or any other person where the evidence was even similar to that now before us. However, we must recognize the holdings of the Supreme Court of the United States in cases so very similar that they cannot be distinguished from that now before us. Galveston County, with several thousand Negro voters, has had two Negroes on grand juries during the past thirty years. This showing will not satisfy the court that has definitely and positively expressed its view on the question of discrimination in the authorities cited.

The judgment of the trial court is reversed and the prosecution is ordered dismissed.

GRAVES, Judge (dissenting):

The statutes of Texas relative to the selection of grand jurors are explicit, and such commissioners must possess the following qualifications:

"1. Be intelligent citizens of the county and able to read and write.

"2. Be qualified jurors and freeholders in the county.

"3. Be residents of different portions of the county.

"4. Have no suit in said Court which requires the intervention of a jury

"5. The same person shall not act as Jury Commissioner more than once in the same year. (Art. 333, Vernon's Ann. C.C.P., 1948)."

These three men shall select sixteen men from different portions of the county as grand jurors, who shall each have the following qualifications:

"1. He must be a citizen of the State, and of the county in which he is to serve, and qualified under the Constitution and laws to vote in said county; but, whenever it shall be made to appear to the court that the requisite number of jurors who

have paid their poll taxes can not be found within the county, the court shall not regard the payment of poll taxes as a qualification for service as a juror.

"2. He must be a freeholder within the State, or a householder within the county.

"3. He must be of sound mind and good moral character.

"4. He must be able to read and write.

"5. He must not have been convicted of any felony.

"6. He must not be under indictment or other legal accusation for theft or of any felony. (Art. 339, Vernon's Ann. C.C.P., 1948)."

The statute makes no further demands relative to such grand jurors other than as above stated. Naught is found in our statutes relative to whom they shall be, nor to the method as to how they shall be listed, nor as to their color or race.

It is stipulated herein that no person of the Negro race, save one, for a period of thirty years had served on a grand jury in Galveston County, and the argument follows that one judging the present by the past, the claim is made that such shows a discrimination against the colored race upon the part of jury commissioners in the past and at the present time. In other words, this is trying the present jury commission upon the action of commissioners of the past thirty years and finding the acts of these earlier commissioners conclusive of the discrimination of the present three commissioners. This is ex post facto testimony at least. This record shows the presence of seven Negroes on the trial jury venire and one wonders if such reflects discrimination against appellant's race.

One is again led to wonder how long will this record of commissioners of the past remain the standard on which a court should decide that such ancient acts of those long since passed from the stage of action as the scales in which a high court would weigh the acts and motives of the present jury commissioners.

If due process of law means a fair and impartial trial, enforcement officers should be told how long they should be under a prejudgment of the higher court as having violated the American Common Law, as found not in a statute but in the decisions of the high court of the land.

Furthermore, one wonders which ones of our statutes have been repealed by a quasi-legislative authority, as for instance, the statute relative to the appointment of an attorney for a defendant only in a matter charging a capital offense.

One wonders again where it is said, either by statute or in common-law decisions, that due process of law depends upon the actions of men for thirty years back.

I, therefore, enter my dissent herein upon the belief that this man has received a fair and impartial trial (Lisenba v. California, 314 U.S. 219-243, 86 L. Ed. 167, especially p. 180, Headnote 12) and that there has been no unfair discrimination against him shown; that the acts of the past grand jury commissioners are neither conclusive nor persuasive of the acts of the present commissioners in the selection of the grand jury that found the indictment against appellant, nor do I find aught against the fairness of his treatment before this trial jury.

It is apparent from the facts herein presented that it would be incredible to believe that any grand jury, no matter of what color composed, could fail to return an indictment against this man for this useless killing. The finding of an indictment alone by this grand jury is the matter at issue, and not the trial upon the merits. I do not think the personnel of this grand jury, nor of the previous grand juries for a long period of time, could have affected the giving of a fair and impartial trial of this appellant before a trial jury on a murder indictment found by any grand jury.

Recognizing the futility of a dissent in this cause, nevertheless, my views are herein expressed, based on the conviction that this man has had a fair and impartial trial; that a useless thing would be done by dismissing this indictment, to be again heard by another grand jury composed in some part at least of men of different races.

I, therefore, respectfully dissent herein.

### ON STATE'S MOTION FOR REHEARING

GRAVES, Judge.

In our original opinion herein, this court, as well as many other judges throughout this state, had labored under the impression that the cases cited in our original opinion had held

in effect that the intentional exclusion of Negroes upon a grand jury venire would offend against what the Supreme Court of the United States had decided the Federal Constitution meant by "due process of law" as set forth in its Fourteenth Amendment thereto, which reads in part as follows:

"* * * nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

It is here worthy of comment that this article nowhere mentions the words "color or race," but such phrase is found in the Fifteenth Amendment wherein the state is prohibited from denying or abridging the right to vote on account of race, color, or previous condition of servitude.

The case of Neal v. Delaware, 103 U. S. 370, 26 L. Ed. 567, is not perfectly clear as to its holding. However, the Constitution of Delaware did provide, at such time, that jurors in all courts should be composed of white men. Justice Field, with peculiar foresightness, did foresee that eventually the problem would arise that a Caucasian or Mongolian might, under such attempted denial of his right to sit as a juror, offer the demand that he be presented before a jury composed entirely of his own race, this latter idea being one towards which the decisions of this court were thought by so many to be finally progressing. It must be remembered that the element in the Delaware Constitution limiting the jurors to the white race had not been repealed at the time of the decision in the case of Neal v. Delaware, supra. While same was decisive of the question of the removal of Neal to the Federal Court, its decision was only persuasive relative to the line of cases later decided and here referred to.

In Norris v. Alabama, 294 U.S. 587, 79 L. Ed. 1074, 55 Sup. Ct. 579, we first find the court using the general proposition that the continued exclusion of Negroes from juries is in itself alone evidence of intentional discrimination against them, regardless of the contra testimony of the person preparing the lists of prospective jurors to be submitted to the jury commissioners. We thus find present grounds at least for a wide belief among the legal fraternity that such a failure to present possible Negro jurors is of itself satisfactory proof to the U. S. Supreme Court of intended exclusion and therefore lack of due process of law.

In Pierre v. Louisiana, 306 U.S. 354, 83 L. Ed. 757, 59 Sup. Ct. 536, it was provided by law that after ascertainment of a certain amount of names, there should be drawn 300 names as prospective jurors and out of such names the court should select 20 citizens out of 50 names supplied possessing the qualifications of grand jurors and out of such 20 names the court should select the 12 who should constitute the grand jury. The remaining members of the venire were to constitute the petit jury. It was admitted by the trial court that the list of the jurors called as a petit jury bore evidence of a discrimination against Pierre, and he quashed such portion thereof and ordered another jury to be drawn, but failed to quash the grand jury venire, they being the one finding the indictment. Evidently the trial court gave credence to the statute relative to the qualifications demanded thereunder for grand jurors. It was shown by the proof that for about 60 years no Negro was drawn and but one had served in any capacity as a juror, and that the population of such parish was about equally divided between the white and colored races. This was held to be a denial of due process of law.

We then come to the case of Smith v. Texas, 140 Tex. Cr. R. 565, 136 S.W. 2d 842, 311 U.S. 128, 85 L. Ed. 84, 61 S. Ct. 164, in which it was held that although the state statutes of Texas relating to the selection of grand jurors is not unfair, nevertheless, the outcome of the matter empowers the U. S. Supreme Court, as a finder of facts, to conclude that the frequent placing of a Negro's name on such grand jury list as No. 16 in itself evidenced discrimination against the race, even though such discrimination is denied by the grand jury commissioners. Again, such court resorts to the population argument and finally practically determined for itself the fact that although the Texas statutory scheme is not unfair, that the execution thereof does become unfair if the commissioners fail to not only select possible Negro grand jurors, but it also determines the numerical place on the presented list of such person. Juror population cannot be determined by poll taxes issued in Texas at least. Women pay poll taxes also, but under the present law, they cannot serve on juries, and a fair estimate should equally divide the poll taxes as between the sexes.

Again, there is a difference in the standard required by law between grand and petit jurors. Our "not unfair" statute prescribes a higher standard for a grand juror. Art. 339, Vernon's

Ann. C.C.P., provides that (1) he must be a citizen and qualified to vote, thus requiring a poll tax in Texas; (2) he must be a freeholder in the state or a householder in the county; (3) he must be of sound mind and good moral character; (4) he must be able to read and write; (5) he must not have been convicted of any felony, and (6) he must not be under indictment or other legal accusation for theft or felony.

It should be seen that the number of poll tax payers is not of much value in determining the qualifications nor fitness of probable grand jurors; and the use of such would mislead one as to whether an individual would fit the standard thus set for a grand juror; a sound mind and good moral character being a fair requisite for a grand juror in Texas; acquaintanceship at least with the individual should be required, especially on the ground of good moral character, and such being not a matter of reputation but of knowledge, it becomes difficult to see how a commissioner could adhere to such an admonition unless he knew the desired person and was familiar, not only with his reputation but also with his moral character, as well as his record as a citizen.

In the case of Hill v. Texas, 114 Tex. Cr. R. 415, 157 S.W. 2d 369, 316 U.S. 400, 86 L. Ed. 1559, 62 S. Ct. 1159, it appears that the motives of the commissioners in drawing the grand juries for many years past is utilized as cogent testimony that the present commissioners were also guilty of discrimination, laying down a punitive measure because of the sins of our fathers and a decision of "like father like son."

Under this line of decisions above mentioned, once having opened Pandora's box, this court found itself under the settled idea that the above cases were reversed because the U. S. Supreme Court found itself of the belief that Negroes had been discriminated against because of their color and race in that they were not drawn on grand juries and none were members thereof wherein indictments were found against members of their race, and such was denounced by the U. S. Supreme Court as unfair discrimination. Therefore, the judges of Texas were careful to instruct their jury commissioners not to discriminate in any manner against any person, and under a fair effort many commissioners tried to find colored persons who met the requirements of the statute as a grand juror. However, in the most recent case of Cassell v. Texas, reported in Law Ed. Advance Opinions, Vol. 94, No. 13, pp. 563,577, (216 S.W. (2d) 813) 154

Tex. Crim. Rep., 648, we are led to believe that such interpretation of these opinions was in error. In that case reference is made to Akins v. Texas, 325 U.S. 398, 405, 89 L. Ed. 1692, 65 S.Ct. 1276, wherein the doctrine of a pro rata representation on such grand juries is repudiated. Nevertheless, we find such proportions used as a basis of argument relative to such discrimination, and was used in Neal v. Delaware, supra, and Pierre v. Louisiana, supra, as well as adverted to in Hill v. Texas, supra. With such repudiation we find the Cassell case, supra, declaring "that the Constitution requires only a fair jury selected without regard to race. Obviously the number of races and nationalities appearing in the ancestry of our citizens would make it impossible to meet a requirement of proportional representation. Similarly, since there can be no exclusion of Negroes as a race, and no discrimination because of color, proportional limitation is not permissible."

The Cassell case, supra, was reversed because it was shown that the commisisoners knew but one Negro whom they thought measured up to the statutory qualifications and he could not serve. In other words, that cause was reversed because the commissioners did not hunt for and find Negroes who were of sound mind and good moral character, etc. This fair test cannot be made by assuming that such virtues exist. They cannot be assumed because of population, that is, that some citizens out of many are bound to possess such qualities. Such can only be ascertained by acquaintanceship, and under the testimony of the commissioners in this (Cassell) case, they knew of but one and he refused to serve. While others might have possessed a good reputation as given him by his neighbors, his character was another matter. Although the record therein does not disclose a purposeful and designed exclusion in such case, it is held, 70 S. Ct., page 634, that it indicates that the commissioners attempted to do their duty, but that they misconstrued what was their duty and thought under Hill v. Texas, supra, that one Negro on the grand jury would satisfy the requirement of such decision. We quote from the Caswell case, 70 S. Ct., page 635, as follows:

"This is of course a misconception. The prohibition of the Constitution against discrimination because of color does not require in and of itself the presence of a Negro on a jury. But neither is it satisfied by Negro representation arbitrarily limited to one. It is not a question of presence on a grand jury nor absence from it. The basis of selection cannot consciously take color into account. Such is the command of the Constitu-

tion. Once that restriction upon the State's freedom in devising and administering its jury system is observed, the States are masters in their own household. If it is observed, they cannot be charged with discrimination because of color, no matter what the composition of a grand jury may turn out to be."

In other words, it seems that if Negroes are not on the grand jury, it does not necessarily show discrimination, and if they are not on the grand jury, such is not discrimination, but a failure to inquire and "learn whether there were persons among the Negroes they did not know who were qualified and available for service" would result in discrimination.

An inquirer is led to wonder whether in the states that have no grand juries provided by statute but present their felonies by means of information, in what manner they are to be governed by the cases herein discussed. Again, in Texas, county court prosecutions can be presented by complaint and information. In a search for discrimination, the county attorney is the instigator of such prosecutions. We know of none ever having held such position in our memory save white persons. All judges since the days of the Reconstruction, as well as justices of the peace, and also legislators, have been white persons; and it is only left as a matter of speculation how far the needs of our fathers shall be the basis of an assumption of misdeeds for the present generation.

After all, the grand jury's finding is but preliminary, as is also the finding of the justice of the peace; and no conviction can be had by a grand jury, and it only takes the vote of nine to present an indictment.

Due process of law means only "a fair and impartial trial" upon the facts. Lisenba v. California, 314 U.S. 219-243, 86 L. Ed. 167.

The ultimate end and the purpose of an indictment in the states requiring same in felony cases is the trial of the case before a petit jury. Nine men can find an indictment, but it requires twelve men and a unanimous verdict to assess a penalty. Grand juries are but preliminary to the final trial of a case.

In the present case, the motion to quash being based upon stipulations alone, we find the statement made by appellant's

diligent attorney, among other things, that no Negro has served, or been selected to serve, as a grand jury commissioner in Galveston County for the past thirty years, and during such term only two Negroes have served as grand jurors therein. Appellant bases his motion to quash and contention of discrimination on the above facts. The stipulation, however, goes further and shows that as to petit juries, the wheel system prevails in such county, as is shown by Articles 2094-2095, Revised Civil Statutes of the state, that is, that the names of all taxpayers in the county are taken from the tax rolls and placed in a receptacle called the "wheel" and rotated therein, and names are drawn therefrom by certain officers and these make up the list of petit jurors utilized in court as needed. It is agreed that such is a fair method and no complaint is lodged thereat. Again, it is agreed that no discrimination is complained of in the method of selecting such petit jurors, and that in said "wheel" there is placed the names of all Negroes in such county whose names appeared on such tax rolls preceding the return of this indictment, and that such were fairly drawn therefrom. There is not now, nor has there been for many years, any discrimination relative to petit or trial juries in Galveston County. The stipulation continues:

"Of the panel drawn for the trial of the defendant eighty-two men appeared and qualified of which number, thirteen were Negroes being approximately fifteen percent (15%). Seven Negroes were examined before the jury to try defendant was completed; of these seven, four were peremptorily challenged by the State, one was excused by the Court because of sickness, and two were challenged for cause, because opposed to capital punishment. When the jury of twelve were completed, there remained six Negroes on the unexamined panel. Defendant used twelve peremptory challenges, the State used six.

"That after the return of the indictment in the instant case, to-wit: The December, 1948 Grand Jury, two Negroes were appointed, and served; on the February, 1949, Grand Jury, one Negro was selected by the commissioners, but claimed his legal exemption because of being a practicing physician.

"That the population of Galveston County, Texas, according to the 1940 United States Census was 81,173, of which 17,712 were Negroes; that the Negro population of Galveston county, Texas, constitutes slightly more than twenty-one (21) percent, of the total."

It appears therefrom that it is admitted by appellant that he received a fair and impartial trial before the petit jury that tried him in such county. However, it is evident from his bills of exception that he complains because of the state's exercising its peremptory challenge against four of the Negroes present in the petit jury panel. Such matters surely are relegated to the judgment of the state's attorney, and its exercise cannot be governed by judicial fiat.

If due process of law resolves itself into a fair and impartial trial, then appellant admits having received such, regardless of the color of a grand jury commissioner, or the actions thereof in the past. As said in the original opinion, we cannot bring ourselves to conceive of any grand jury that would hesitate to present for trial one who, in the perpetration of robbery, would shoot his victim as his hands were upraised, and then attempt to malign his brethren of like color by expecting them to refuse to indict him for his misdeed. The question of an indictment can be taken for granted by any twelve men who fill the statutory requirements for grand jurors. To believe otherwise would shock one's conscience and shake faith in the civilization which a democratic people have builded through the years. The ultimate end of a trial is a fair trial. Appellant agrees that he has received such. We agree that the effect of a quashal of this indictment would be a useless thing, and as Justice Jackson said in the Cassell case, would be holding in effect "that the crime of discrimination offsets the crime of murder and that the State must start over again, if death or witnesses, loss of evidence or other conditions wrought by time do not prevent."

It is our judgement that this appellant has received a fair and impartial trial as he admits, and thus believing, the state's motion for a rehearing is granted, the order of reversal is set aside, and the judgment is now affirmed.

### ON STATE'S MOTION FOR REHEARING

HAWKINS, Presiding Judge (Concurring)

My views are expressed in the State's Motion for Rehearing prepared and filed by the Honorable Raymond E. Magee, County Attorney of Galveston, Texas. I have decided to adopt it as my concurring opinion. Omitting the formal heading and the closing prayer and signature, it is as follows:

"In reversing the judgment of the trial court and ordering

dismissal of the prosecution of appellant under the present indictment this Honorable Court felt itself enjoined to so rule by reason of the holdings of the Supreme Court of the United States in Smith vs. Texas, 85 L. Ed. 84, and Hill vs. Texas, 86 L. Ed. 1559. This is evidenced by the following quotation from the opinion:

" 'The facts in those two cases are so similar to those shown in the agreed statement found in the present record that no reasonable ground can be discovered why the holding of the Supreme Court of the United States in those cases would not be followed by that court in this case.'

"We respectfully but most earnestly contend that the record in this case presents an agreed set of facts that clearly distinguishes it from both the Smith and Hill cases, as well as from all other cases decided by the Supreme Court on this subject including the Cassell case: That if this case is permitted to reach the Supreme Court it will present a simple and clear-cut question of law that has never been passed upon or presented to that court.

"It will permit and require the Supreme Court to declare definitely and unequivocally whether the Fourteenth Amendment to the Federal Constitution demands (in felony prosecutions against negroes) that there be no discrimination against negroes—or conduct from which such discrimination might be inferred—, in the selection of grand jurors or in the selection of grand jury commissioners, AND THAT SUCH IS THE LAW EVEN THOUGH IT BE ADMITTED THAT NO DISCRIMINATION WAS PRACTICED TO BAR NEGROES FROM THE PETIT OR TRIAL JURY WHICH TRIED AND CONVICTED NEGRO GRAND JURY.

"It will require that court to decide, in principle, whether a negro convicted by a petit jury of twelve negroes can complain that he was denied the equal protection of the laws because he was brought to trial upon an indictment presented by a grand jury composed of twelve white men: It will decide whether a negro convicted and deprived of his life, liberty or property by a petit jury of twelve negroes on an indictment voted and returned by a grand jury consisting of twelve negroes can still contend he was denied the equal protection of the laws BECAUSE NEGROES WERE DESIGNEDLY EXCLUDED

FROM THE COMMISSION THAT SELECTED THE ALL NEGRO GRAND JURY.

"The record in this case with the co-operation of Thomas H. Dent, Esq., appellant's attorney, who incidentally is also of the negro race, has been carefully prepared so as to put these questions squarely before the Supreme Court free from any fact issue. To the present the Supreme Court has not ruled with appellant's contention and if the law is as so contended by appellant the people of the State of Texas and of the entire Southland are entitled to have the Supreme Court so state clearly and definitely. Such a ruling is most appropriate and necessary for the due administration of the penal laws of the State of Texas as well as the nation as a whole.

"The Defendant, Herman Lee Ross, by his attorney of record, has stipulated and agreed in effect as follows:

"(a) That in so far as the selection, drawing and summoning of petit juries are concerned there is not now and has not been for many years any discrimination practiced in Galveston County against negroes.

"(b) That for many years Galveston County has been operating under what is known as the 'Jury Wheel' law, which requires the names of all male persons residing in the county and whose names appear on the tax lists in the Tax Assessor's Office, to be written on cards of uniform size and character and placed in said jury wheel. The filling of the wheel to be done annually by the Sheriff, County Clerk, District Clerk and Tax Assessor.

"(c) That the names of all negroes residing in Galveston County appearing on the tax lists on the 1st day of August preceding the return of the indictment in this case were placed in the jury wheel as required by law.

"(d) That no discrimination was practiced in the selection of the panel from which the trial jury was selected in this case and that no discrimination has been practiced in the drawing of the names of jurors from said wheel in this county for many years.

"(e) That of the panel drawn and summoned for the trial of the Defendant in the instant case 82 men appeared and qualified of which number 13 were negroes, being approximate-

ly 15% of the total. Seven negroes were reached on voir dire examination before the jury of twelve was completed; of these seven four were peremptorily challenged by the State; one was excused by the court because of sickness, and two were challenged for cause because opposed to capital punishment; that when the jury of twelve was completed there still remained six negroes on the unexamined panel; that Defendant used only twelve of his fifteen peremptory challenges and the State used six.

"(f) That in addition to stipulating the facts as above summarized Defendant further stipulated that he makes no contention that there is now or has ever been any discrimination practiced in Galveston County against negroes serving on petit or trial juries.

"Notwithstanding these admissions and the further fact that Defendant exercised only twelve of his fifteen peremptory challenges, thus making no attempt to have any of the negroes still on the panel placed on the jury, and that he accepted each of the twelve white jurors without objection, he contends he was denied equal protection of the laws, contrary to the Fourteenth Amendment.

"But for the apparent holding in the Smith and Hill cases, to which now must be added the Cassell case, this contention would sound actually silly. And if the Supreme Court meant to so hold in those cases we must confess to an incapacity to comprehend its line of reasoning.

"Such a holding would as above suggested permit a negro tried and convicted by a jury composed entirely of members of his own race to contend he had been denied the equal protection of the laws because discrimination had been practiced *either* in the selection of the grand jury that indicted him *or* in the selection of the commissioners who in turn had selected said grand jury, even though said grand jury was likewise composed entirely of negroes.

"If this is logical reasoning and if it is the law, would not the argument, by easy transition, that absence of negroes from the bench of this Honorable Court, and for that matter from the Supreme Court of the United States, likewise constitute a denial of the equal protection of the laws. The answer that our Texas judiciary are elected by the people and the Fourteenth

Amendment forbids only a *State* from depriving a person of life, liberty or property without due process of law, etc., does not satisfy. The judges of the Supreme Court are appointed just like grand jury commissioners and grand jurors. The judges of some of the States are appointed and Texas has the power to change the method by which its judges are selected. An indictment like an information or complaint is merely the formal charge by which an accused is brought to trial. It carries no presumption of guilt this Honorable Court has held it to be reversible error for a trial court to fail to so charge upon request. The Fifth Amendment to the Federal Constitution applies only to Federal courts and Texas can abolish the office of an indictment and bring offenders, even for capital offenses, to trial by information or complaint (Bollin vs Nebraska, 44 L. Ed. 382). This being true then would it not be just as logical to argue that the absence of negro police clerks, justices of the peace, assistant district and county attorneys and other clericals who have to do with passing upon the credibility of the complainant, weighing the evidence and preparing and filing the complaint or information, constitutes a denial of due process as to raise the point with respect to grand jurors and grand jury commissioners?

"The fallacy in Appellant's contention springs from the false premise that the formation, personnel or complexion of a grand jury can result or tend to result in depriving an accused from receiving a fair and impartial trial. The Fourteenth Amendment guarantees that no person shall be deprived of life, liberty or property without due process of law and that no person shall be denied the equal protection of the laws. But grand jury commissioners and grand jurors do not perform the function to or have the right or power to pass upon the guilt of an accused and to deprive him of his life, liberty or property. This is the sole and exclusive province of the trial or petit jury whose unanimous verdict is necessary to convict of crime. Let us repeat here that Herman Lee Ross agrees he was tried and convicted by a jury selected without discrimination and that he makes no contention he was denied the equal protection of the laws in so far as his trial jury was concerned.

"To appreciate the maze of complexity and uncertainty to which the state courts are being lead by the Supreme Court in such cases as Smith, Hill and Cassell it should be remembered that the phrase 'racial discrimination' does not appear in the

Constitution. That is a phrase coined by the Supreme Court. Discrimination as to nationality and religion can just as logically be termed denial of due process as racial discrimination. True, this Court said in Sanchez vs State, 181 SW (2) 87;

" 'In the absence of a holding by the Supreme Court that nationality and race bear the same relation within the meaning of the Constitutional provisions mentioned, we shall continue to hold that the law of this State furnishes the guide for the selection of juries in this State.'

. "We find no record that certiorari in the Supreme Court was sought by Sanchez. Justice Field's dissent in Neal vs Delaware is interesting and logical reading on this phase of the question. Also Justice Murphy's dissent in Akin vs Texas, 89 L. Ed. 1692, which was joined in by Justices Stone and Black, indicate a variance from your Honors views as expressed in the Sanchez case. Who can say what future opinions may bring in this respect.

"The question whether racial discrimination in the selection of grand and petit jurors violated the Fourteenth Amendment first came before the Supreme Court in the year 1881 (only a few years after the adoption of that amendment) in Neal vs Delaware, 26 L. Ed. 567.

"It is a historical fact that the people of the State of Delaware while remaining in the Union, were nevertheless bitterly opposed to the adoption of the Fourteenth Amendment. The Amendment was rejected by the Legislature of Delaware on February 7th, 1867, and it was not until February 1901 that Delaware ratified said Amendment.

"As reflected in the opinion no denial was made or attempted that negroes were excluded from all jury service at the time in question. It was boldly asserted by the officials of the State of Delaware in the Neal case that all or practically all negroes were so lacking in intellect, honesty and morality as to be unfit to perform jury duty.

"The Supreme Court was dealing with open defiance to the clear spirit intent and purpose of the Fourteenth Amendment. The court was dealing with a political as well as a judicial question. The members of this court if not familiar with the opinion in the Neal case will read same, therefore we will not burden this motion with quotations therefrom. That opinion

cannot be construed as holding that absence of negroes from grand juries and from commissions appointed to select grand jurors, standing alone, violates the Fourteenth Amendment.

"Neal vs Delaware was followed nineteen years later by Carter vs Texas, 44 L. Ed. 839 (decided April 1st, 1900).

"In the Carter case motion was made to quash the indictment and dismiss the prosecution because of discrimination against negroes in the selection of both the grand and petit juries. He charged that negroes had been excluded from all jury service in Galveston County for many years by reason alone of their color. He offered to prove his charges. The State made no denial and the court refused to permit any evidence to be offered on the motion. The case was reversed by the Supreme Court on authority of Neal vs Delaware.

"The next time the question was presented to the court was in Norris vs Alabama, 79 L. Ed. 1074 (decided April 1st, 1935). Again the motion to quash charged that negroes had for many years been excluded from all jury service in the county where the indictment was returned as well as in the county where it was brought to trial, by reason alone of their color.

"The record showed without question the charge was true. The Supreme Court went into the evidence thoroughly and not only so found but also found the record had been 'doctored' so as to falsely make it appear that negroes' names appeared on the jury lists. We will burden this motion with but a short quotation from the Norris case:

"'We are of the opinion that the evidence requires a different result from that reached in the State Court. We think the evidence that for a generation or longer no negro had been called for any jury service in Jackson County; that there were negroes qualified for jury service * * * but that no names of negroes were placed on the jury rolls, establishes the discrimination which the Constitution forbids.'

"Norris vs Alabama was followed by Pierre vs. Louisiana, 83 L. Ed. 757, (decided February 27th, 1939). Again the charge was made and not denied that negroes had for many years been excluded from both grand and petit jury service in the parish in question by reason alone of their color. It seems that a general panel of jurors were selected from which both the grand jury and the trial juries were drawn. Motion was made

to quash both the grand and petit jury panel. The State made no denial of Pierre's charges. The trial court granted the motion to quash the petit jury panel but overruled the motion to quash the grand jury panel. The Supreme Court reversed on authority of Neal vs Delaware and Norris vs Alabama.

"In the Pierre case the court came closer to the point presented in the instant case than in any other case wherein the court said that the same reasons that prompted the trial court to quash the petit jury should have prompted it to quash the grand jury panel. Such casual expression however should not be accepted as a mature and final expression on so important a matter.

"Up to this time the Supreme Court was dealing with situations showing a real and substantial discrimination against negroes for all jury service.

"Then comes Smith vs Texas, 85 L. Ed. 84 (decided November 25, 1940). The entire opinion deals with the manner of selecting grand juries in Harris County. No mention whatever is made with reference to the manner of selecting petit juries. No authorities are cited in the opinion although the foot notes refer to the Neal, Norris, Carter and Pierre cases. Justice Black simply states that the method employed in Harris County in the selection of grand juries constituted a denial of due process of law.

"The Hill case decided June 1st, 1942, less than 18 months after the Smith case likewise makes no reference to the manner of selecting petit juries but the following significant statement appears in the opinon:

" 'Certiorari was granted in this case on Neal vs. Delaware, 26 L. Ed. 567.' More than sixty years ago, in Neal v. Delaware, *a case substantially like the present,* this court laid down the rule which we think controlling here; "the showing thus made, including as it did, the fact (so generally known that the court felt obliged to take judicial notice of it) that no colored citizen had ever been summoned *as a juror in the courts of the State,* —although its colored population exceeded twenty thousand in 1870, and in 1880 exceeded twenty six thousand, in a total population of less than one hundred and fifty thousand,—Presented a prima facie case of denial, by the officers charged with the selection of grand *and petit* jurors, of that equality of protection which has been secured by the Constitution and laws of the United States." '

"To summarize the Neal case is cited by the Supreme Court as authority for all the later cases on the subject. In the Neal, Carter, Norris and Pierre cases the record affirmatively shows negroes were barred from all jury service. In the Smith, Hill and Cassell cases the record is silent as to the method used in selecting petit juries. This case would present for the first time to the Supreme Court a record wherein it was admitted there was no discrimination in the selection of the trial or petit jury. This is a real and substantial distinction and entitles it to be presented to the Supreme Court.

"While Texas was sustained in the Akins case, 89 L. Ed. 1692, Justice Murphy's dissenting opinion adds confusion and uncertainty to holdings in the Smith and Hill cases. And this confusion and uncertainty is increased by the decision in the Cassell case as indicated in newspaper reports. Justice Murphy frowned upon the practice of consistently putting any particular number of negroes on the grand jury whether that number be one or five. He says the record (Akins case) reflects this was done in Dallas County and ' " to that extent they have ignored the ideals of the jury system.' "

" 'As pointed out by Judge Davidson in the Cassel case, 154 Tex. Cr. R. 648, 216 S.W. (2d) 813, the officials of Dallas County have sincerely and honestly endeavored to follow the mandate handed down by the Supreme Court in the Hill case but the Supreme Court's action in the Cassell case shows they have failed to satisfy the Supreme Court.

"The time has come when the Supreme Court should be urged to re-examine its views on this subject. It may be a long time before this court again has before it a record which so clearly and indisputably presents the sole question of Constitutional law involved.

"If this court is satisfied Ross has had a fair and impartial trial but for the question of jury discrimination it should not hesitate to, and we respectfully say it is the court's duty to withdraw its opinion reversing this case and affirm the judgment of the trial court so that the Supreme Court will be called upon to write again, and definitely, upon this important subject. A clear-cut and definite expression from the Supreme Court is most necessary and desirable to the nation as a whole in the proper enforcement of its criminal laws. This court should aid in securing such ruling.

"The press reports are to the effect that Justice Jackson in his dissent in the Cassell case said:

" 'This court has never explained how discrimination in the selection of a grand jury, illegal though it be, has prejudiced a defendant whom a trial jury, chosen without discrimination, has convicted.'

"This is exactly the argument we make and Justice Jackson's words indicate the light is dawning. By the time this case reaches the Supreme Court very probably other members of the court will be converted to his line of reason."

When the rule of inclusion or exclusion as announced in the Cassell case is applied to the actual organization of a grand jury in this state, it will render impotent and nugatory our statutes regulating the formation of grand juries in this state which have been approved by the Supreme Court of the United States as being not unfair and as being capable of being fairly enforced, and which, by practical application and use in this state throughout its history, have been found to be reasonable, fair, and sufficient.

I can not agree that this be done without again giving our United States Supreme Court the opportunity to re-examine the question.

ON APPELLANT'S MOTION FOR REHEARING

WOODLEY, Judge.

Appellant's motion for rehearing is devoted to his contention that racial discrimination as a matter of law in violation of the Fourteenth Amendment to the Constitution of the United States is shown by the following stipulated facts:

1. No Negro has ever served or been selected to serve as a grand jury commissioner in Galveston County for the past thirty-one years.

2. For a period of thirty years next preceding the return of the indictment in this cause only two Negroes have served as grand jurors in Galveston County.

3. The grand jury that indicted the defendant in this cause consisted of twelve white men.

Other stipulations bearing upon the question include the

following: "that in so far as the selection, drawing and summoning of petit or trial juries are concerned there is not now and has not been for many years any discrimination against Negroes in Galveston County."

The stipulation indicates that two Negroes had served as grand jurors in Galveston County. The exact time of their selection is not shown.

If selected at the previous term or at a recent term, an abandonment of the practice of excluding Negroes, rather than the existence of discrimination might well be inferred.

The question raised in this motion has received the close attention and study of all members of this court, and it would serve no useful purpose to write further upon it.

. We cannot agree that the personnel of the grand jury commission, regardless of their race, is of consequence—their sole function is to select the members of the grand jury panel.

Should they select an all Negro panel, certainly it could not be urged that a conviction of a Negro accused must be set aside because the commission was composed only of whites.

If there be no discrimination in the selection of the grand jurors, appellant has no basis for complaint.

We remain convinced that the trial court properly overruled appellant's motion to quash the indictment upon his finding that discrimination in the selection of the grand jury was not shown.

Furthermore, he having received a fair and impartial trial before a trial jury selected admittedly without discrimination, we think appellant's constitutional rights were not violated.

The motion for rehearing is overruled.

Opinion approved by the court.

### ORDER

GRAVES, Presiding Judge.

The judgment of conviction was affirmed by the Texas Court

of Criminal Appeals on June 7, 1950, and appellant's motion for rehearing was overruled October 25, 1950, and mandate issued.

Thereafter, appellant made application to the Supreme Court of the United States for a writ of certiorari which was granted, and on April 30, 1951, the Supreme Court reversed the judgment of the Court of Criminal Appeals of Texas and remanded said cause for further proceedings not inconsistent with said order of the Supreme Court of the United States.

Therefore, in compliance with said order this cause is now remanded to the District Court of Galveston County, 56th Judicial District, for further proceedings not inconsistent with the opinion of the Supreme Court of the United States.

This the 6th day of June, 1951.