## SMITH *v.* TEXAS.

No. 33.  Argued November 14, 1940.—Decided November 25, 1940.

*Mr. Sam W. Davis,* with whom *Messrs. William A. Vinson* and *Harry W. Freeman* were on the brief, for petitioner.

*Mr. George W. Barcus,* Assistant Attorney General of Texas, with whom *Messrs. Gerald C. Mann,* Attorney General, and *Lloyd Davidson,* State Criminal Attorney, were on the brief, for respondent.

Mr. Justice Black delivered the opinion of the Court.

In Harris County, Texas, where petitioner, a negro, was indicted and convicted of rape, negroes constitute

over 20% of the population, and almost 10% of the poll-tax payers; a minimum of from three to six thousand of them measure up to the qualifications prescribed by Texas statutes for grand jury service. The court clerk, called as a state witness and testifying from court records covering the years 1931 through 1938, showed that only 5 of the 384 grand jurors who served during that period were negroes; that of 512 persons summoned for grand jury duty, only 18 were negroes; that of these 18, the names of 13 appeared as the last name on the 16 man jury list, the custom being to select the 12 man grand jury in the order that the names appeared on the list; that of the 5 negroes summoned for grand jury service who were not given the number 16, 4 were given numbers between 13 and 16, and 1 was number 6; that the result of this numbering was that of the 18 negroes summoned, only 5 ever served, whereas 379 of the 494 white men summoned actually served; that of 32 grand juries empanelled, only 5 had negro members, while 27 had none; that of these 5, the same individual served 3 times, so that only 3 individual negroes served at all; that there had been no negroes on any of the grand juries in 1938, the year petitioner was indicted; that there had been none on any of the grand juries in 1937; that the service of negroes by years had been: 1931, 1; 1932, 2; 1933, 1; 1934, 1; 1935, none; 1936, 1; 1937, none; 1938, none.

It is petitioner's contention that his conviction was based on an indictment obtained in violation of the provision of the Fourteenth Amendment that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." And the contention that equal protection was denied him rests on a charge that negroes were, in 1938 and long prior thereto, intentionally and systematically excluded from grand jury service solely on account of their race and color. That a conviction based upon an indictment returned by a jury so

selected is a denial of equal protection is well settled,[1] and is not challenged by the state. But both the trial court and the Texas Criminal Court of Appeals were of opinion that the evidence failed to support the charge of racial discrimination. For that reason the Appellate Court approved the trial court's action in denying petitioner's timely motion to quash the indictment.[2] But the question decided rested upon a charge of denial of equal protection, a basic right protected by the Federal Constitution. And it is therefore our responsibility to appraise the evidence as it relates to this constitutional right.[3]

It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community. For racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it[4] but is at war with our basic concepts of a democratic society and a representative government. We must consider this record in the light of these important principles. The fact that the written words of a state's laws hold out a promise that no such discrimination will be practiced is not enough. The Fourteenth Amendment requires that equal protection to all must be given—not merely promised.

Here, the Texas statutory scheme is not in itself unfair; it is capable of being carried out with no racial dis-

---

[1] *Pierre* v. *Louisiana*, 306 U. S. 354; *Martin* v. *Texas*, 200 U. S. 316, 319; *Carter* v. *Texas*, 177 U. S. 442, 447.

[2] 136 S. W. 2d 842.

[3] *Chambers* v. *Florida*, 309 U. S. 227, 228; *Pierre* v. *Louisiana*, 306 U. S. 354, 358; *Norris* v. *Alabama*, 294 U. S. 587, 590.

[4] "No citizen possessing all other qualifications . . . shall be disqualified for service as grand or petit juror in any court of the United States, or of any State, on account of race, color, or previous condition of servitude; . . ." 18 Stat. 336, 8 U. S. C. § 44.

crimination whatsoever.[5]   But by reason of the wide dis-
cretion permissible in the various steps of the plan, it is
equally capable of being applied in such a manner as
practically to proscribe any group thought by the law's
administrators to be undesirable.   And from the record
before us the conclusion is inescapable that it is the latter
application that has prevailed in Harris County.   Chance
and accident alone could hardly have brought about the
listing for grand jury service of so few negroes from
among the thousands shown by the undisputed evidence
to possess the legal qualifications for jury service.   Nor
could chance and accident have been responsible for the
combination of circumstances under which a negro's
name, when listed at all, almost invariably appeared as
number 16, and under which number 16 was never called
for service unless it proved impossible to obtain the
required jurors from the first 15 names on the list.

The state argues that the testimony of the commis-
sioners themselves shows that there was no arbitrary or
systematic exclusion.   And it is true that two of the three
commissioners who drew the September, 1938, panel tes-
tified to that effect.   Both of them admitted that they
did not select any negroes, although the subject was dis-
cussed, but both categorically denied that they inten-
tionally, arbitrarily or systematically discriminated
against negro jurors as such.   One said that their failure

[5] The statutory scheme is set out in the Texas Code of Criminal
Procedure, Articles 333–350.  At each term of court, three grand jury
commissioners are appointed; at the time they are sworn in, the judge
instructs them as to their duties; they are required to take an oath
not knowingly to select a grand juror whom they believe unfit or
unqualified; they must then retire to a room in the court house, tak-
ing the county assessment roll with them; while in that room they
must select a grand jury of 16 men from different parts of the county;
they must next seal in an envelope the list of the 16 names selected;
thirty days before court meets the clerk is required to make a copy
of the list and deliver it to the sheriff; thereupon the sheriff must
summon the jurors.

to select negroes was because they did not know the names of any who were qualified and the other said that he was not personally acquainted with any member of the negro race. This is, at best, the testimony of two individuals who participated in drawing 1 out of the 32 jury panels discussed in the record. But even if their testimony were given the greatest possible effect, and their situation considered typical of that of the 94 commissioners who did not testify, we would still feel compelled to reverse the decision below. What the Fourteenth Amendment prohibits is racial discrimination in the selection of grand juries. Where jury commissioners limit those from whom grand juries are selected to their own personal acquaintance, discrimination can arise from commissioners who know no negroes as well as from commissioners who know but eliminate them. If there has been discrimination, whether accomplished ingeniously or ingenuously, the conviction cannot stand.

*Reversed.*