## ROGERS LEE KING V. THE STATE.

No. 21530. Delivered May 7, 1941.
Rehearing Denied June 18, 1941.
In order that defendant might file application for Writ of Certiorari
to Supreme Court of United States, issuance of mandate
stayed for 90 days, June 19, 1941.
Upon failure of defendant to file application for Writ of Certiorari,
order staying issuance of mandate set aside and clerk
directed to issue mandate, December 4, 1941.

28

The opinion states the case.

*Ray Holder*, of Dallas ,for appellant.

*Lloyd W. Davidson*, State's Attorney, of Austin, for the State, on submission.

KRUEGER, Judge.

The offense is murder. The punishment is death.

Appellant killed the deceased, H. M. Wallace, while in the act of robbing him.

The only question presented for review is whether or not there was race discrimination practiced by the jury commissioners in the selection of the grand jury which returned the indictment in the instant case. Appellant filed a motion to quash the indictment based on the ground that the jury commissioners, in the selection of prospective grand jurors, discriminated against the negro race of which he was a member in that they intentionally and deliberately declined to select members of the negro race for grand jury service; that such practice had been engaged in and had been followed in Johnson County by the jury commissioners since time immemorial, etc.

The testimony adduced at the hearing of the motion is brought forward by a separate statement of facts. We deem it proper to here state in substance the testimony given by the various witnesses touching the question under consideration:

Mrs. Lois White testified that she lived in Cleburne in Johnson County; that in 1940 she took the census in the town of Alvarado, which is located in said county; that the town had a population of 1321 people, some of whom were negroes; that about one-fifth or one-sixth of the population of said town were negroes; that the negro population all over the county was not that high; that the eastern part of the county had a greater ratio of negroes than the balance of the county; that the negro population of the town of Cleburne was smaller than that of Alvarado.

Mr. Goggin Poindexter testified that he was engaged in taking the census of 1940; that he worked in two districts in the county; that one district was from the Nolan River to the Hood and Somervell County lines, which is in the western part of Johnson County; that the other place was in the Lillian District, which is in the northwestern part of the county. In the western section he ran into a very small negro population. There was no negro church, no preachers or negro school in that district. In the Lillian District he found very few negroes. He did not know exactly the negro population of Johnson County. The census of 1930 showed 1944 negroes, but the negro population for 1940 was less than it was in 1930. He knew some negroes personally. He knew one negro school teacher who

had died. Negroes with whom he came in contact during the past few years were mostly illiterate; that those who had become educated had gone elsewhere. The few negroes with whom he came in contact could neither read nor write. There were some young negroes under 21 years of age who claimed they could read and write. In the western part of the county the adult negroes between the ages of 21 and 60 claimed they could not read or write; that he did not find any negroes between the ages of 21 and 60 while taking the census who claimed they could read or write. Outside of the negro school teachers, who are exempt under the law, there were possibly four or five negroes at the Santa Fe Railroad shops who were qualified, but they "run in and out of here" and he did not know whether they would be available for jury service. The population of the county was approximately 30,000; that the percentage of negroes was very small. In 1930, there was about one negro to every fifteen white people in Johnson County.

Mr. Gibson testified that he was a member of the jury commission that selected the grand jury which returned the indictment in the instant case; that there were no negroes on the grand jury which they selected; that in the past he had served about four times as jury commissioner; that the most recent time besides the present was about one and one-half or two years ago; that he did not select any negroes on the grand jury at that time; that the next time before that when he was a member of the jury commission was about two years prior thereto; that they did not select any negroes on the grand jury at either time. He did not know whether there had ever been a negro on the grand jury in Johnson County or not; that the four grand juries which he helped select did not have a negro as a member thereof; that he did not know of any negro business men in the county. He knew some negroes who worked at the Santa Fe shops about ten or twelve years ago at which time he was employed there. It was his opinion that the ratio of the negroes to the whites in the county is less than one to five; that he did not know of any negro in Johnson County who was qualified to act as a grand juror. He did not intentionally leave off the name of any negro from the grand or petit jury; nor did he intend to discriminate against the negro or colored race in the selection of the grand jury which returned the indictment in the instant case. He said they discussed among themselves some of the negroes; that they considered Charlie Alexander for one but concluded that he was entirely too old for service; that

they also discussed a fellow by the name of Tom Rhone and they put him on the list of petit jurors for the term.

W. A. Kelly and Harry Atlas, other jury commissioners, testified in substance to the same facts as did A. F. Gibson.

Mr. Beaver, the District Clerk, testified that he had been so employed since the first of January, 1937; that he had lived in Johnson County for thirty-five years but had never served as a member of a jury commission to select grand and petit jurors. He stated that since this trial was set he had occasion to examine the record of the grand juries for the four years he had been in office; that he was familiar in most cases with the personnel of the grand juries; that during that time there were some negroes selected as grand jurors; that one negro was selected as a grand juror in 1938, and also in 1939; that they had had eleven negroes on the regular jury panel during the last four years. He stated, "We have four negroes summoned for jury service during the year 1940; we have no negroes selected as grand jurors for 1940."

Mr. Frank Metze testified that he was foreman of the grand jury which returned the indictment against the appellant; that they did not have any negroes on the grand jury; that he had served on several grand juries prior to this time but that there were no negroes on either of the prior grand juries.

Webb Benson testified that he lived in Cleburne; that he did not know any negroes in Cleburne but knew some in Grandview; that he had never served on the grand jury before the present time.

Mr. Goen testified that he lived near the town of Rio Vista in Johnson County; that he had formerly lived in Grandview and knew Mr. Atlas, one of the jury commissioners who selected the grand jury which returned the indictment in the instant case; that there were no negroes in the town of Rio Vista; that there were a few negro farmers out in the county on the farms.

Mr. Ingle testified that he lived four miles east of Grandview; that this was the first time he had served as a member of the grand jury in Johnson County; that he did not recollect that he ever heard of a negro being selected or summoned as a grand juror in said county.

Mr. Atlas, upon being recalled by the State, testified that he remembered that there was a reputable negro citizen near Grandview but that he had been indicted for stealing and they could not take him; that there was another negro by the name of Tom Hood who had been convicted; that he did not know of any other negroes who were competent and capable to sit on the grand jury; that the negro, Tom Hood, formerly had a pretty good reputation until the last two or three years when he "back slid or fell from grace."

John Prestridge testified that he had lived at Alvarado for sixty-five years; that he had been Justice of the Peace there since 1937; that he was acquainted with the colored population in Alvarado; that he knew "what it takes" to make qualified jurors; that he did not know of a single colored man in Alvarado or its vicinity, over the age of 21 years, who is a qualified juror; that Alvarado is the second largest town in Johnson County and has a population of about 1,300; that ten per cent of the people are negroes; that he did not know of a single negro who would be qualified as a grand juror.

Mr. Head testified that he lived at Grandview and had lived there for forty-six years; that he had been Justice of the Peace there for about eighteen years; that he was well acquainted with the colored population of Grandview, which is the third largest town in Johnson County; that there are no poll-tax payers among the colored people in Grandview; that he did not know of a single colored person in Grandview who possessed the necessary qualifications to make a qualified juror. He said: "There are very, very few negroes who own property down there"; that he had examined the poll-tax list for voting boxes Nos. 17 and 18 and did not find a single negro who had paid his poll-tax.

Oran Smith testified that he had been sheriff of Johnson County for seven years and was acquainted with the population around Godley but did not know of a single colored person living in and around that community; that there are no negroes in or around the town of Joshua; nor are there any negroes in the town of Burleson or in the immediate vicinity thereof. He testified that Cleburne has a considerable negro population; that most of the colored folks live in East Cleburne; that they have a negro school and this school has been in operation for quite a number of years. They have some negro places of business in Cleburne. One is a restaurant and one is

a grocery store. They are operated by negroes. The owner of one of these places of business is a reputable citizen but the other one is disreputable. The witness did not know whether the reputable negro could read and write. The ratio of negroes in Johnson County to the white population is approximately one negro to twenty white people.

Judge O. B. McPherson of the 18th Judicial District of Texas, which includes Johnson County, testified that he was serving his twelfth year in that capacity; that during the time he had been district judge two or three negroes had been selected as grand jurors; that he always instructed the jury commissioners not to discriminate against the colored race, the Mexican race or any other races, or because of religion or anything of that kind; that for the past eight or ten years most of the jury panels had from one to three colored men on them. "There had been a number of colored men brought here on the jury panels and had been questioned." The witness did not think that any negro had served on the petit jury; that on one occasion one negro qualified but the attorneys on the other side excused him. There had been quite a few negroes selected on the jury panel, approximately fifteen or twenty or possibly more, in the last eight or ten years, but only one qualified. During his tenure of office the witness did not recall that any negroes had served on the grand jury other than the two spoken of by the District Clerk. There are three terms of court each year: one in October, one in January, and one in May; that they lasted for from seven to ten weeks.

This, in substance, constitutes the entire testimony on the subject.

It is obvious from the testimony that appellant has failed to show that there were any number of resident citizens of Johnson County who were of African descent and belonged to the negro race who possessed the necessary qualifications prescribed by Article 339, C. C. P., so as to qualify for grand jury service. It is not shown how many, if any, negroes between the ages of 21 and 60 years were freeholders in the State or householders in the county, could read and write and were of good moral character, etc. It clearly appears from the testimony of Judge McPherson that of the 20 or 25 negroes summoned for jury service during the past ten years only one could qualify. The qualifications prescribed by law apply to all races alike and must be observed and respected as much as

any other statute. To do otherwise relative to the negro race would be discrimination in their favor. We do not understand that the Fourteenth Amendment to the Federal Constitution, which guarantees to the citizens of the United States equal protection of the law, requires that in the selection of the grand jurors there must be some negroes, Mexicans, Italians or Greeks selected as grand jurors where any of such nationality is to be indicted or that he is entitled to a mixed jury. All that the law requires is that there must not be any discrimination practised in the selection of grand and petit juries by reason of his race. The mere fact that there were no negroes selected as grand jurors in the instant case, in the absence of a showing that there were any number of men of such race who possessed the required qualifications, would not be a circumstance from which an inference of discrimination against that race might logically be drawn.

From the case of Thomas v. State of Texas, 212 U. S. 278, 29 Sup. Ct. 393, 53 L. Ed. 512, we take the following quotation:

"It was ruled in Martin v. Texas, 200 U. S. 316, 50 L. Ed. 497, 26 Sup. Ct. Rep. 338, as in other cases, that discrimination in organizing a grand jury and empaneling a petit jury cannot be established by merely proving that no one of the defendant's race was on either of the juries, and that an accused person cannot of right demand a mixed jury, some of which shall be of his race, nor is a jury of that kind guaranteed by the 14th Amendment to any race."

The Martin case, supra, has not been overruled, at least, we have not found any decision which holds to the contrary.

We are not unmindful of the pronouncements by the Supreme Court of the United States construing the equal protection and due process clauses of the Fourteenth Amendment to the Federal Constitution as applied to the trial of criminal cases in state courts for violation of the laws of the states. See Norris v. Alabama, 294 U. S. 587, 590, 55 S. Ct. 579, 580, 79 L. Ed. 1074; Chambers v. Florida, 309 U. S. 227, 60 S. Ct. 472, 84 L. Ed. 716; White v. Texas, 310 U. S. 530, 60 S. Ct. 1032; 84 L. Ed. 1342; Smith v. Texas, 61 S. Ct. 164, and authorities there cited. From these cases it appears that the rules of law governing race discrimination are : (a) that the applicable statute of Texas, (Arts. 333-350, C. C. P.) relative to the selection and organization of grand juries are not of them-

selves unfair and capable of being carried out with no racial discrimination; (b) that the mere fact that one of the negro race is not a member of or empaneled upon a grand jury does not constitute proof of discrimination against members of the negro race in the organization of the grand jury; and (c) that the Supreme Court of the United States will independently examine the facts of every case presented before it to determine whether race discrimination has been practiced against the accused in the organization of the grand jury which returned the indictment upon which the conviction was based.

So long, therefore, as the question rests upon a finding or conclusion of fact, the decisions of the Supreme Court of the United States furnish no guide or rule for the courts of Texas except upon similar fact situations.

We have discovered no decision of the Supreme Court of the United States dealing with a fact situation similar to that here presented. Certainly, it is not that of Smith v. Texas, supra, and to demonstrate such, we have set forth hereinabove the facts as revealed by this record.

The controlling question then is not whether a member of the negro race should have been empaneled upon the grand jury which indicted the appellant but whether the absence of a member of the negro race upon that grand jury resulted alone by reason of discrimination having been practiced against members of the negro race on account of the fact that they were negroes. Believing that no such discrimination is here shown, appellant's contention is overruled.

Appellant's complaint with reference to the court's action in overruling his application for a change of venue is, in our opinion, without merit. First, the application is not supported by two compurgators as required by Art. 562, C. C. P.; and second, the evidence adduced by appellant upon the hearing of the motion wholly fails to show that any prejudice existed against him to such an extent that he could not obtain a fair and impartial trial or that there was a dangerous combination against him, instigated by influential persons, by reason of which he could not expect a fair trial or that his case had been prejudged by the citizens of Johnson County. In the absence of such a showing the court's ruling is justified and eminently correct. The court would have been justified in denying the motion because it failed to comply with the law on the subject

in that the same was not sworn to by two compurgators, nor is there any good reason assigned why two men, either white or colored, could not have been obtained to make the affidavit.

No reversible error having been presented by the record, the judgment is affirmed.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

ON MOTION FOR REHEARING.

GRAVES, Judge.

The original opinion herein treated the only question presented to us, and that was the claim of racial discrimination in the selection of the grand and petit juries in Johnson County that were concerned in the indictment and trial of this cause. We are content to leave such matters with the discussion thereof in the original opinion.

The facts show that appellant, an eighteen-year-old negro boy, who lived in Odessa, Texas, had started on a series of wandering about the country, riding on trains, and any other means of travel, until he possessed himself of a 1937 gray colored Dodge car. That he had also traded for a 45 calibre pistol, and on September 26, 1940, he was in Johnson County traveling rather aimlessly about from town to town, evidently bent on some kind of mischief, he having possessed himself of a pair or rubber gloves. He had reached the town of Alvarado, and went to a filling station operated by Mr. H. M. Wallace, and evidently purchased 13 gallons of gasoline, and then in an attempted holdup of Mr. Wallace the appellant shot Mr. Wallace four times, twice through the arm and twice through the body, from which wounds Mr. Wallace died; but before his death he identified appellant as the man who had shot him, and remarked to him: "It didn't do you much good to get the 13 gallons of gasoline, did it boy?" Other witnesses saw the actual firing of the last three shots, and they testified that Mr. Wallace was dodging behind the gas pump while appellant was shooting him.

Appellant made a written statement in which he detailed the facts, and made out a complete case against himself, admitting that he shot Mr. Wallace in an attempt at robbery, a portion of such statement we quote:

"I asked the white attendant about selling him the gun I had. He told me no he wouldn't need one. Then I tried to sold it to him for a tank of gas. He told me there wasn't nothin doin. I drove off, went about two blocks in the gray Dodge— then I turned around and come back and told the white attendant at the same garage to 'fill it up.' He filled it up. I asked him did he have any smoking or candy, and he said he had candy but no cigarettes. After filling up the car I told him to gimme a coke. He started in the filling station and I got out and followed him. When he went to reach in the soda water box I pulled my gun and told him to get over to the cash register and give me every penny he had. I shot the first time to try to stop him not to hit him. I shot one or two more times and I meant to hit him them times. After I shot the two times he ran to the gas pumps. I runned on out and held the gun on him and made him get away from the car. I drives on off on the Fort Worth highway. He was still standing up when I drove off."

The only defense offered by appellant was that he had been smoking marijuana, and was so greatly under the influence of such narcotic that he had no knowledge of what happened nor what he did neither just prior to nor immediately after the attempted robbery.

The careful trial court gave a comprehensive charge on the doctrine of temporary insanity caused by the voluntary use of intoxicating liquor and the use of narcotics, as well as an instruction relative to the condition of appellant's mind at the time of making the written statement, and we find no objections nor exceptions to any portion of the court's charge in the record. We think such charge an admirable and succinct expression of the law on the subjects treated therein.

According to the long established holdings of this court, and the statutes of this State, we are again impressed with the correctness of our holding in the original opinion herein.

There is no doubt that the testimony shows a studied and unprovoked killing in an attempted robbery of Mr. Wallace, and we have no reasonable grounds to do aught than to overrule this motion.

The motion for a rehearing is overruled.

38

HAWKINS, Presiding Judge.

Upon the request of attorney for appellant an order entered the 19th day of June, 1941, directed the Clerk of the Court of Criminal Appeals to stay the issuance of the mandate for a period of ninety days from said date in order that appellant might file application for a writ of certiorari to the Supreme Court of the United States.

It appears that appellant has taken no steps whatever to apply for a writ of certiorari; this appearing from the absence of any application for a record from the Clerk of this court. It also appears that the Clerk of this court on November 24, 1941, inquired by United States mail of the Clerk of the Supreme Court of the United States as to whether application for writ of certiorari had been filed with the Supreme Court of the United States. In reply to such inquiry the Clerk of the Supreme Court of the United States on November 27th, 1941, informed the Clerk of this court that there was no case appearing on the docket of the Supreme Court of the United States on behalf of appellant, Rogers Lee King.

Therefore, it is directed by this court that the order heretofore made on said June 19, 1941, staying the issuance of the mandate be set aside, and the Clerk of the Court of Criminal Appeals of the State of Texas is hereby directed to issue mandate to have the judgment of this court executed.

This, the 4th day of December, 1941.