**Albert VANLEEWARD, Appellant,**

v.

**Jack T. RUTLEDGE, Sheriff and Custodian of the Common Jail of Muscogee County, Georgia, Appellee.**

**No. 23320.**

United States Court of Appeals
Fifth Circuit.

Dec. 6, 1966.

Howard Moore, Jr., Atlanta, Ga., Albert W. Thompson, Columbus, Ga., for appellant.

Peyton S. Hawes, Jr., Asst. Atty. Gen., Atlanta, Ga., W. B. Skipworth, Jr., Sol. Gen., Columbus, Ga., Joel M. Feldman, Asst. Atty. Gen., Atlanta, Ga., Arthur K. Bolton, Atty. Gen., for appellee.

Before TUTTLE, Chief Judge, BROWN and GODBOLD, Circuit Judges.

TUTTLE, Chief Judge.

This appeal from the denial by the United States District Court for the Middle District of Georgia, Columbus Divi-

sion, of appellant's petition for a writ of habeas corpus, seeks to vacate the judgment and sentence under which he is now awaiting the execution of the sentence of death by electrocution, following a verdict of guilty of rape, without a recommendation of mercy, by a jury of Muscogee County, Georgia. Appellant makes a four-pronged attack upon the validity of his trial and conviction: (1) The jury which convicted and sentenced him to death was organized in violation of the Fourteenth Amendment in that the system under which the venire was selected systematically excluded members of the Negro race; (2) the trial court deprived him of his constitutional rights by admitting in evidence an incriminating statement given by appellant under circumstances that required exclusion on the ground that it was not voluntarily made; (3) the District Court applied an unconstitutional procedure in permitting the jury to pass initially upon the question of voluntariness with respect to the statement, contrary to the principle announced in Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908; (4) the conviction was void because it was based upon a Georgia statute, Section 26–1302, Georgia Code Annotated, because this statute permitted the jury to fix the death penalty or, by recommending mercy, a lesser penalty, but without establishing any ascertainable standards by which the jury's action thereto was to be guided, and was thus unconstitutional on its face; further that it was unconstitutional on its application because of the history of Georgia convictions in like cases involving Negroes, demonstrating that the death penalty was meted out in a greatly disproportionate number of cases to Negro defendants.

The appellant was tried at the December, 1963, term of the Superior Court of Muscogee County. The Supreme Court of Georgia affirmed appellant's conviction and rejected his federal claims, Van-leeward v. State of Georgia, 220 Ga. 135, 137 S.E.2d 452. The United States Supreme Court denied appellant's application for certiorari on April 26, 1965, Vanleeward v. State, 380 U.S. 982, 85 S.Ct. 1348, 14 L.Ed.2d 275. On October 22, 1965, appellant filed a petition in the District Court for writ of habeas corpus and the application was amended on November 30th to include the grounds of attack that have been recited above.

Prior to trial, appellant made the appropriate procedural motion to quash the jury panel, and there is, thus, no question of waiver. The factual background of the attack on the jury venire may be simply stated. Prior to 1960, no Negro was called for jury service in Muscogee County. The last revision of the jury list prior to appellant's trial started in August, 1961, and was completed in March, 1962. The six jury commissioners for the county are all white. They are required, under the state law, to pick from the tax digest of the county "upright and intelligent citizens" to serve as jurors. The tax digests themselves are kept separately for white and Negro taxpayers. That is to say the names of all the white taxpayers are placed alphabetically in one part of the tax book and the names of the Negro taxpayers alphabetically are listed in a separate part of the tax book.[1] As the names from the tax books are chosen by the jury commissioners, they are listed for jury purposes on a single list that has no differentiation or distinguishing marks to indicate the race of the prospective jurors. The traverse jury list for the county at the time of trial contained 3470 names, out of a total of 39,170 names on the tax digest. Of this latter number, approximately 86% were white and 14% were Negroes. The total population figures of Muscogee County of persons 21 years of age and over showed roughly 70% white and 30% Negro. Out of the 3470 names on the traverse jury

1. An attack on this State requirement of separate listing of Negro and white taxpayers when the list is the basis of jury selection, as a separate ground for invalidating the resulting general venire is not dealt with by us because of the direction we give to the case.

list there were only 25 Negroes, less than ¾ of one per cent. The remaining 3445 were white persons. 86 persons were summonsed for the trial of appellant's case. Of these 86, only 1 was a Negro, and he was excused before the case was called for trial.

While each of the jury commissioners called to testify stated that he had not excluded any Negroes on account of race, it is clear from the testimony of all of them, together with the testimony of the Clerk of the Superior Court, who acted as secretary for the Commission, that the system of selecting jurors was to take the last preceding jury list and to run down it and eliminate those who were no longer taxpayers or who, according to information known to one or more of the commissioners, had moved away or had died or was "in trouble." Then the commissioners would go down through the alphabet beginning with the "A" category of white taxpayers and then to the "A" of Negro taxpayers, on down through the alphabet through "Z", adding a sufficient number to bring the list back to the number they thought would be needed for the succeeding two years of court sessions.

It is clear that the policy of the commissioners was to put on the list only the names of those persons known to them or to some of them. When a name came up that some one of the commissioners thought might be an appropriate addition to the list, occasionally some further inquiries or investigations were made to see whether he was suitable. Aside from employees of the commissioners or their companies, the testimony of the commissioners indicates that the commissioners' contact with the Negro community was limited almost entirely "to the boys at the YMCA, the boys at the country club, the boys that operate our service stations. Quite a few that don't come directly under employment." All commissioners testified that their contact with members of the Negro race was much more restricted than their contacts with the white community. There was testimony from several of the commissioners that there were many qualified Negro residents whose names appeared on the tax digest.

■ Whether the standard be a cross section of the entire community, see Smith v. State of Texas, 311 U.S. 128, 130, 61 S.Ct. 164, 85 L.Ed. 84, or a cross section merely of residents of the community whose names appear on the tax digests, cf. Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469, it is at once obvious that the tremendous disparity between the Negro percentage of population 21 years and older (30%) and the Negro percentage of persons on the tax digests (14%) on the one hand and the percentage of Negroes on this jury list of 3470 names (.75%) is so great as to condemn the system that produces such a list. It is not necessary to determine that any of the commissioners, consciously or intentionally, failed to carry out the duties of their office, to conclude that the jury list from which the panel that tried Vanleeward was selected was totally defective. In Scott v. Walker, et al., 5 Cir., 358 F.2d 561, this Court said:

"It is plain from the record here that the commissioners put on the list only those personally known to them. They made no especial effort to ascertain whether there were qualified Negroes in the parish for jury service. In failing to do so they violated the rule announced by the Supreme Court through Mr. Justice Reed in Cassell v. Texas, where it was said, 'When the commissioners were appointed as judicial administrative officials, it was their duty to familiarize themselves fairly with the qualifications of the eligible jurors of the county without regard to race and color. They did not do so here, and the result has been racial discrimination.' 339 U.S. 282 at 289, [70 S.Ct. 629, 633, 94 L.Ed. 839.]"

■ In this case, both the state court and the district court stressed too greatly the element of intentional and purposeful discrimination. The true rule is stated in Patton v. State of Mississippi,

332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76, where it is said:

"When a jury selection plan, whatever it is, *operates* in such a way as to always result in the complete and long-continued exclusion of any representative at all from a large group of negroes, or any other racial group, indictments and verdicts returned against them by juries thus selected cannot stand." (Emphasis added.)

Then, of course, the statement by the Supreme Court in Brown v. Allen, supra, makes it plain that the inclusion of a token number of Negroes is to be treated in exactly the same way as total exclusion. The Court said in Brown v. Allen: "Of course, token summoning of Negroes for jury service does not comply with equal protection, Smith v. State of Texas, 311 U.S. 128 [61 S.Ct. 164, 85 L.Ed. 84.]." 344 U.S. 433, 471, 73 S.Ct. 415.

The testimony by several witnesses that sometimes from one to three and possibly four Negroes had been seen on some panels in the Muscogee Superior Court does not change the fact that for the two years preceding this trial the list as made up was so heavily weighted against the possibility of the inclusion of members of the Negro race in any traverse panel as to cause it to fall within the condemnation of the decided cases.

There is now pending in the United States Supreme Court on certiorari from the Georgia Supreme Court, the case of Sims v. State of Georgia, 221 Ga. 190, 144 S.E.2d 103, 384 U.S. 998, 86 S.Ct. 1953, 16 L.Ed.2d 1013. In that case certiorari was granted covering the points raised in issues listed as Numbers 3 and 4 above. We consider it appropriate to pretermit discussion of the merits of these contentions at this time. However, there is still present for our consideration, the question of voluntariness of the statement obtained from the appellant and introduced against him on the trial.

The facts necessary to an understanding of this question, largely developed for the first time at the habeas corpus hearing, are as follows:

On October 19, 1963, four Negro youths accosted a young white couple who were in a parked car in an isolated portion of Columbus, Georgia. One, allegedly the petitioner, had a gun. After locking the seventeen year-old white youth in the trunk of the car, the four raped his seventeen year-old companion. In the afternoon of October 22nd, about 3:30 o'clock, Albert Vanleeward, the petitioner, also seventeen, was arrested apparently without a warrant.[2] Petitioner was initially questioned for about thirty minutes by the Chief of Police. He was then interrogated off and on by other detectives and officers, approximately four or five officers being present at all times, until about eleven P.M. During the course of this questioning, he was asked to account for his whereabouts the night of the crime and, as he indicated certain alibis these were checked by police officers who brought in several other boys with whom he said, by conflicting stories, that he had spent the evening. The officers told him each time that his story was false and continued to question him until somewhere between ten and eleven P.M. At that time, he was given something to eat. At about midnight, the petitioner told the interrogators that he had talked with somebody who had himself admitted being involved in the offense and had named four companions. The officers, then taking the petitioner along at about one o'clock in the morning, proceeded to round up these five other youths. Upon their return about four A.M., the petitioner was placed in a cell in the County jail. The following

---

2. Although there is no specific testimony as to the presence or absence of a warrant, it seems quite clear from the record that when Vanleeward was taken to the police station on the afternoon of October 22, he was taken there "for investigation" and there was no warrant. Several officers testified that he was not, at that time, "charged" and he was not "charged" until after making the incriminating statement, on October 24th.

afternoon, the police substantiated the story of the other boys that they could adequately account for their whereabouts at the time of the offense and they were released. During the evening of the 22nd, at the request or demand of officers, petitioner gave up his undershorts and removed pubic hairs from his body and furnished them to the officers. At some time during the night of the 22nd, before petitioner was returned to his cell, he went to sleep in the interrogation room with his head on a table.

At approximately seven o'clock on the evening of the 22nd, petitioner's mother and stepfather, a sergeant in the United States Army, came to the headquarters where he was being held and asked permission to see him. This was denied them and his parents stated that they were not informed as to why he was being held, other than that he was being held for interrogation or investigation. The Chief of Police, however, stated that he told the stepfather that he was being interrogated in connection with the rape case. In any event, his parents waited until nearly midnight without seeing him and then returned home. The Chief of Police testified that he had advised the parents that they should get a lawyer for him. This was denied by the parents. The parents phoned several times before the next afternoon and were told, on each occasion, that they could not see him, and that he was still being held under a "routine investigation." They could not identify the person they talked to other than that it was the person who answered the telephone.

On the evening of the 23rd, several lineups were held, and the victim and her companion picked Vanleeward out of the lineup as the person who accosted them and committed the crime. Thereafter from about nine P.M. to 11:30 P.M., the appellant was again interrogated. At 11:30 P.M., he began to give his statement to the officers. Prior to taking down this statement, the police officers told petitioner that he did not have to make a statement, and if he did, it would be used against him in a trial, and they also told him that, if his parents would not get a lawyer for him, one would be appointed for him. In response to his inquiry, they also told him that they would tell the judge that he had told the truth.[3]

On the 24th, the petitioner was charged. In the afternoon, his mother employed a lawyer, but when the lawyer appeared at the jail to see the petitioner, he was not permitted access to him. It was only after getting in touch with the Chief of Police that he was able to see the petitioner, approximately 3 hours after his first attempt. Although the testimony is not completely clear on the subject, it appears that the policy of the department was, at the time, not to permit an attorney to see those under investigation for a capital offense until charged, or without the prior approval of the Chief. Petitioner's parents sought to see him after he was charged on the 24th, but were not allowed to do so until two days later, on account of there being regular visiting hours on Saturday.

During the trial the State sought to introduce the statement signed by Vanleeward. The trial court declined to permit appellant's counsel on a voir dire proceeding out of the presence of the jury to introduce the testimony supporting his attack on the voluntariness of the statement. The trial court permitted counsel to cross examine the police officer upon whose testimony the statement was being tendered in evidence, but decline to permit appellant to introduce testimony of his own. Furthermore, under the Georgia procedure, the trial court

---

3. It is not completely clear exactly how the discussion of the lawyer was worded, but it seems plain from the record that the officers were telling him that, having given a statement that would involve a trial, the court would appoint a lawyer for him to represent him at the trial if his parents failed to do so. There is no testimony that he was advised before he was questioned or before he started to make inculpatory statements that he could consult with a lawyer before making a statement.

stated that he would submit the question of voluntariness to the jury under a proper charge, the court stating, "At this time the court will decide that the statement is sufficient to go to the jury. The jury will properly be instructed as to their responsibility to determine if it was voluntary."

This method of permitting the jury to make the initial determination on the issue of the voluntariness is challenged by appellant here as it is by the appellant in Sims v. State of Georgia, in the case now pending in the Supreme Court, the contention being that the decision of the Supreme Court, in Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, held that the Constitution condemns a state procedure which leaves the ultimate determination of the voluntariness of a confession and the resolution of disputed issues of fact relevant to voluntariness to the same jury which is charged with deciding the issue of guilt or innocence. As we have stated, the presence of this issue before the Supreme Court in the *Sims* case makes it unnecessary for us to decide whether the procedure adopted by the trial court here meets the constitutional requirements. However, upon a full hearing in the habeas corpus count the facts above outlined were adduced. Thus it is open for us now to determine whether the statement was voluntary.

■ We conclude that the statement given by this 17 year old boy who had been arrested without a warrant and held incommunicado for questioning from approximately 3:30 P.M. until 11:00 P.M.; who was required to surrender his clothing and pubic hairs for tests; was required to accompany the police between 1:00 A.M. and 4:00 A.M. to test his asserted alibis; was then, after several lineups in the evening of the second day, questioned from approximately 9:00 to 11 o'clock P.M. without having been warned prior to the questioning that he did not have to answer questions, and without being advised that he could contact a lawyer upon his apprehension, and considering all the circumstances outlined earlier in this opinion, cannot, in light of this Court's decision in Collins v. Beto, 5 Cir., 348 F.2d 823, be held to be a voluntary statement. Cf. Gallegos v. State of Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 and Davis v. State of North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895.

In order that a new trial be not unduly delayed awaiting a decision by the Supreme Court on the procedural question, we think it appropriate to determine this issue of voluntariness now upon the full record developed in the District Court on habeas corpus.

■ It appearing from the record that all of the evidence supporting the determination which we made as to the jury selection process is completely without dispute and comes from the testimony of the jury commissioners themselves, we find it unnecessary to remand the case to the district court for findings of fact, but, in order that a new trial may be had as promptly as can be accomplished, which is always desirable in capital cases such as this, we reverse the judgment of the trial court dismissing the petition for a writ, and direct that the writ be issued and the judgment of conviction and sentence be set aside to permit the state to proceed with a new trial.

Reversed.