## STATE v. HERMAN V. DILLIARD.

157 N. W. (2d) 75.

March 8, 1968—No. 40,782.

*Robins & Meshbesher* and *Ronald I. Meshbesher,* for appellant.

*Douglas M. Head,* Attorney General, *George M. Scott,* County Attorney, and *Henry W. McCarr, Jr.,* and *David C. Weinberg,* Assistant County Attorneys, for respondent.

KNUTSON, CHIEF JUSTICE.

Defendant was indicted by the grand jury of Hennepin County for unlawfully prescribing a narcotic drug. He has moved to quash the indictment on the grounds that it was returned by a grand jury which was selected in violation of Minn. St. 628.41 and in violation of the Fourteenth Amendment of the United States Constitution.

The motion was heard by a three-judge court composed of Judges John A. Weeks, Theodore B. Knudson, and Donald T. Barbeau. They denied the motion and certified the question to this court as important and doubtful, thereby making the legal issue involved reviewable under § 632.10.

The motion was heard on a stipulation of facts under which it is agreed that the grand jury venire in Hennepin County is drawn by a so-called personal selection system under which members of the jury are drawn by lot. At the time of the hearing there were 16 judges of the District Court of Hennepin County. In this state they are elected for 6-year terms. Each of the judges submits seven or eight names with two or three alternates at a meeting of the full court in November of each year. At that meeting there is a full discussion of the names on the list of each judge to see if there is any duplication or if any suggested name should be excluded because of statutory exemption or otherwise. Approximately 125 names are selected from those so submitted and given to the clerk of district court, who puts the names in a box. When the time comes for drawing a grand jury, the clerk brings the box before the judge in charge of the criminal calendar and an order is signed for the

drawing of the jury. Then, in the presence of the judge and a deputy clerk of court, the clerk draws from the box the names of 23 persons who will comprise the grand jury. This procedure is followed twice a year; the grand jury normally serves approximately 6 months, one group starting in March and the other in September of each year.

It is stipulated that each prospective grand juror originally selected by the respective judges is selected because the judge either knows him or knows of his position in the community. It is further stipulated that the judges, in exercising their judgment as to who shall be on the grand jury venire, have in mind the prospective jurors' intelligence, common sense, stability, and fitness for the job, regardless of walk in life or geographical situs in the county.

The stipulation also describes the manner in which a list of persons to serve on petit juries is compiled. In November of each year the city directories of cities in the county, the rural polling lists, and polling lists from towns and villages are apportioned among the 16 judges. Each judge is given a section of the Minneapolis city directory and assigned a portion of the other city directories or voters' registration lists. Each judge selects approximately 400 names from the section of the Minneapolis city directory given him and approximately 325 names from the other assigned lists; the only exclusions from them are those excluded by statute. Thus, the 16 judges draw approximately 11,600 names for petit jury service each year. We are not concerned with the manner of drawing the petit jury in this case except to point out that the method followed in drawing names for service is different from that used for drawing the grand jury venire.

It is stipulated that of the 125 persons submitted for the grand jury venire in 1966, 4 were Negroes.

Defendant's attorneys hired a special investigator, who examined the 1966–1967 grand jury venire of 120 names to determine the occupation of the persons placed on the venire. The investigator's affidavit asserts that this inquiry showed the following breakdown: Corporate executive officers, 37 percent; self-employed, 5 percent; retired persons, former occupations unknown, 11 percent; union executives, 13 percent; educators, 3 percent; housewives, 12 percent; un-

skilled laborers, none; hourly wage earners, .8 percent; miscellaneous occupations, 8 percent; occupations unknown, 10 percent. One of defendant's attorneys submitted a supplementary affidavit in which he asserted that an investigation of the grand jury venires for the 16 years beginning in 1950 showed that no unskilled laborers have been on the list for that period.

It might be stated at the outset that these affidavits were submitted after the trial court made its determination and ordinarily should not be considered here, but since they were made a part of the settled case by stipulation, we will take them into consideration. They are, however, practically worthless because the breakdown does not show whether corporate executive officers came from large or small corporations; whether retired persons were formerly unskilled laborers; whether "miscellaneous" occupations included the classes of people which defendant now complains were omitted; or whether "occupations unknown" included such persons.

Defendant is a Negro. His main contention is that almost no Negroes serve on the grand jury and that persons from low-income groups have consistently been excluded.

As far as the first claim is concerned, it was stipulated that 4 Negroes were on the venire in 1966. Whether they were drawn from the box was merely a fortuitous circumstance. It is agreed that the population of Hennepin County is about 2 percent Negro, so that the percentage of Negroes on the venire would be at least consistent with the percentage of Negroes in the entire population of the county. There is no showing as to how many Negoes were on the venire in prior years. The only showing is that Negroes did not ordinarily serve on the grand jury. But that, too, may well have been due to the fact that they were not drawn from the venire by lot.

Certain rules with respect to drawing a grand jury have evolved over the years. It is settled that discrimination against a racial group in the selection of a grand jury denies persons indicted by that jury equal protection of the law. Carter v. Texas, 177 U. S. 442, 20 S. Ct. 687, 44 L. ed. 839; Hernandez v. Texas, 347 U. S. 475, 74 S. Ct. 667, 98 L. ed. 866. Discrimination need not be intentional to fall

within the constitutional ban. In Smith v. Texas, 311 U. S. 128, 61 S. Ct. 164, 85 L. ed. 84, the commissioners charged with selecting the grand jurors sought to justify the absence of Negroes on the lists by pointing out that they were unacquainted with qualified Negroes. Mr. Justice Black, speaking for the court, rejected this attempted justification, saying (311 U. S. 132, 61 S. Ct. 166, 85 L. ed. 87):

"* * * Where jury commissioners limit those from whom grand juries are selected to their own personal acquaintance, discrimination can arise from commissioners who know no negroes as well as from commissioners who know but eliminate them. If there has been discrimination, whether accomplished ingeniously or ingenuously, the conviction cannot stand."

This doctrine was reiterated in Hill v. Texas, 316 U. S. 400, 62 S. Ct. 1159, 86 L. ed. 1559, and Cassell v. Texas, 339 U. S. 282, 70 S. Ct. 629, 94 L. ed. 839.

A great many cases are to be found in the books regarding the validity of a system of selecting jurors, either grand or petit, where certain segments of the population are excluded. Most of the cases come from areas where Negroes represent a substantial percentage of the population, and the number of Negroes selected to serve on juries has been greatly disproportionate to the ratio of Negroes to the whole population. The rule concerning the selection of jurors is not difficult to ascertain, but the application of it often becomes difficult when challenged. Examination of a few cases may be of some help.

In the recent case of Whitus v. Georgia, 385 U. S. 545, 549, 87 S. Ct. 643, 646, 17 L. ed. (2d) 599, 603, decided January 23, 1967, the court said:

"For over fourscore years it has been federal statutory law, 18 Stat. 336 (1875), 18 U. S. C. § 243, and the law of this Court as applied to the States through the Equal Protection Clause of the Fourteenth Amendment, that a conviction cannot stand if it is based on an indictment of a grand jury or the verdict of a petit jury from which Negroes were excluded by reason of their race."

In Mobley v. United States (5 Cir.) 379 F. (2d) 768, 771, where many of the controlling cases are collected, the court said:

"The burden of proof is on the person attacking selection procedure to show 'the existence of purposeful discrimination' by the exclusion of Negroes on account of race from jury participation. Whitus v. State of Georgia, supra; Fay v. People of State of New York, 332 U. S. 261, 285, 67 S. Ct. 1613, 1626, 91 L. Ed. 2043 (1947). Purposeful discrimination may not be assumed or merely asserted, it must be proven. Swain v. State of Alabama, 380 U. S. 202, 85 S. Ct. 824, 13 L. Ed. 2d 759 (1965). 'When Negro representation on venire lists is not extremely disproportionate to the Negro population in the parish [county], the burden may be a heavy one.' Labat v. Bennett, 5 Cir., 1966, 365 F. 2d 698, 712. However, juries must be drawn from a fair cross section of the community. Smith v. State of Texas, 311 U. S. 128, 61 S. Ct. 164, 85 L. Ed. 84 (1940); Glasser v. United States, 315 U. S. 60, 62 S. Ct. 457, 86 L. Ed. 680 (1942); Thiel v. Southern Pac. Co., 328 U. S. 217, 66 S. Ct. 984, 90 L. Ed. 1181 (1946); Scott v. Walker, 5 Cir., 1966, 358 F. 2d 561, 564. The jury must, therefore, be 'drawn from a pool of persons broadly representative of the community', Rabinowitz v. United States, 5 Cir., 1966, 366 F. 2d 34, 45, for 'It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community.' Smith v. State of Texas, supra."

The above is illustrative of statements that are found in the cases and states the applicable law. However, in examining the numerous cases on this subject, it should be observed that where Negroes have been excluded, the number chosen for jury service was so far less in proportion to the number found in the population that discrimination could easily be assumed without additional proof. That is not true here. The grand jury venire in 1966 shows 4 Negroes out of 125, a percentage comparable to the 2 percent of Negroes in the population. The mere fact that Negroes were not chosen from the venire by lot does not establish discrimination.

Based on the stipulation of the parties, there is no indication that

Negroes were excluded from the grand jury venire either intentionally or unintentionally. We see no need of discussing the claim further.

With respect to the claim that the selection system discriminates against low socio-economic classes, there may be more difficulty. But here, again, the stipulation submitted to the trial court, even when coupled with the affidavits made part of the settled case, falls far short of establishing such discrimination. A grand jury venire which consists of only 125 names out of an estimated 900,000 population obviously cannot include proportionate representation from every economic group in the area. Nor is such proportionate representation required. In Swain v. Alabama, 380 U. S. 202, 85 S. Ct. 824, 13 L. ed. (2d) 759, it was held that the selection must "reasonably [reflect] a cross section of the population, suitable in character and intelligence for this civic duty." See, also, Brown v. Allen, 344 U. S. 443, 73 S. Ct. 397, 97 L. ed. 469.

While no one would or could argue that individuals qualified to serve as grand jurors cannot be found among working people as a class, there are some difficulties in procuring wage earners who can be away from their work for the length of time generally required by grand jury service. However, in view of the requirement of Brown v. Allen, *supra,* these difficulties would not excuse complete exclusion of wage earners from the venire. It will not do to say that the judges are unacquainted with working people. That argument was rejected in Smith v. Texas, *supra,* and other cases of the same tenor. Nor can the judges intentionally eliminate those from working classes, because that, too, is an indication of discrimination.

The difficulty here is that the proof submitted to the court, particularly the stipulation, does not establish that there was any discrimination against such classes.

Defendant relies quite heavily on the case of Rabinowitz v. United States (5 Cir.) 366 F. (2d) 34. This is an extremely long opinion by a badly divided court. Several opinions were written, in which the members of the court either dissented or concurred specially with the court's opinion. Defendant's position would seem to be that the court in Rabinowitz held invalid the key man grand jury selection

system used in many Federal courts. If there is any such implication to be drawn from the opinions written by the various judges, it was dispelled by the same court in the later case of Mobley v. United States (5 Cir.) 379 F. (2d) 768, 773, where we find the following:

"Though we held in Rabinowitz v. United States, 5 Cir., 1966, 366 F. 2d 34, that the 'key man' system of juror selection, coupled with an impermissible departure from the federal statutory scheme, produced a 'poisoned' basic jury list, and that 'the fruits of that list were also infected' (Id. at 60), we did not thus declare the 'key man' selection system illegal as such. See Scales v. United States, 367 U. S. 203, 259, 81 S. Ct. 1469, 6 L. Ed. 2d 782 (1961). We felt that the facts in Rabinowitz warranted a holding that the jury list was improperly constituted because the jury selectors applied 'wrong standards' and used 'grossly inadequate sources.' "

Even defendant admits that the Federal courts have never held the key man selection system per se invalid.

Moreover, it appears that defendant would lack standing to assert discrimination against lower socio-economic classes even if such discrimination did exist. Defendant, a medical doctor, is not a member of that class. In Hernandez v. Texas, 347 U. S. 475, 477, 74 S. Ct. 667, 670, 98 L. ed. 866, 870, the Supreme Court said that exclusion of a class from jury service "may * * * deprive a defendant *who is a member of that class* of the constitutional guaranty of equal protection of the laws." (Italics supplied.) Ballard v. United States, 329 U. S. 187, 67 S. Ct. 261, 91 L. ed. 181, cited by defendant for a proposition seemingly at variance with the language quoted from Hernandez, is not applicable.

Thus, it appears that while the system of selection in Hennepin County might be open to objection if it could be proved that either Negroes or persons of low economic status were generally excluded, we do not think that the system itself is either constitutionally unsound or that defendant has shown any misuse of the system that could possibly have been prejudicial to him.

With respect to defendant's final argument, that, even if constitutionally sound, the method of selection violates Minn. St. 628.41, about all we need to say is that we find no such violation. Minn. St. 593.14 relates to the method of selection of grand and petit juries in Hennepin, Ramsey, and St. Louis Counties, and provides in part:

"In all counties having a population of more than 100,000, judges of the district court, or a majority thereof * * * shall * * * select from the qualified electors of the county 125 persons properly qualified to serve as grand jurors, and 2,000 persons properly qualified to serve as petit jurors, and shall make out and certify separate lists thereof, and forthwith deliver such lists to the clerk of the district court of the county; and from these lists of persons * * * shall, respectively, be drawn all grand jurors and petit jurors at any time required for the transaction of business in the district court of such county."

Section 628.41 requires that a grand jury be chosen by lot. There is no requirement anywhere that the venire be chosen by lot. The grand jury was and is chosen by lot from the venire, and we think this sufficiently complies with our statute. Section 593.14, as noted above, provides that the judges shall select from qualified electors of the county 125 persons properly qualified to serve as grand jurors. Selection implies some degree of volition, and we think that where a grand jury venire is composed of so small a percentage of the total population of the area affected, a system such as that by which petit jurors are chosen (where the numbers are considerably greater) might lead to a greater possibility of discrimination than the system now in vogue.

The argument is sometimes leveled at the personal selection system, such as is used in Hennepin County, that it permits the "packing" of a jury. Here the venire, consisting of only 125 names, is selected by 16 judges who are elected for 6-year terms. They come from various parts of the county. It is inconceivable that any one judge or any group of judges could contrive to pack the jury venire against any defendant. Certainly there is no proof of it here.

We therefore answer the legal question certified to us by holding that the method of selecting grand jurors in Hennepin County is not invalid on constitutional grounds and that there is no proof to establish an improper use of the system prejudicial to any rights of defendant.

Order denying motion to dismiss indictment affirmed.